# UNITED STATES ET AL. *v.* AMERICAN LIBRARY ASSOCIATION, INC., ET AL.

No. 02–361.   Argued March 5, 2003—Decided June 23, 2003

REHNQUIST, C. J., announced the judgment of the Court and delivered an opinion, in which O'CONNOR, SCALIA, and THOMAS, JJ., joined. KENNEDY, J., *post*, p. 214, and BREYER, J., *post*, p. 215, filed opinions concurring in the judgment. STEVENS, J., filed a dissenting opinion, *post*, p. 220. SOUTER, J., filed a dissenting opinion, in which GINSBURG, J., joined, *post*, p. 231.

*Solicitor General Olson* argued the cause for appellants. With him on the briefs were *Assistant Attorney General*

McCallum, Deputy Solicitor General Kneedler, Irving L. Gornstein, Barbara L. Herwig, and Jacob M. Lewis.

Paul M. Smith argued the cause for appellees. With him on the brief for appellees American Library Association, Inc., et al. were Theresa A. Chmara, Daniel Mach, Elliot M. Mincberg, and Lawrence S. Ottinger. Christopher A. Hansen, Ann Beeson, Steven R. Shapiro, Charles S. Sims, Stefan Presser, and David L. Sobel filed a brief for appellees Multnomah County Public Library et al.*

CHIEF JUSTICE REHNQUIST announced the judgment of the Court and delivered an opinion, in which JUSTICE O'CONNOR, JUSTICE SCALIA, and JUSTICE THOMAS joined.

To address the problems associated with the availability of Internet pornography in public libraries, Congress enacted

---

*Briefs of amici curiae urging reversal were filed for the State of Texas by Greg Abbott, Attorney General, Barry R. McBee, First Assistant Attorney General, Jeffrey S. Boyd, Deputy Attorney General, Philip A. Lionberger, Solicitor General, and Amy Warr and Ryan D. Clinton, Assistant Solicitors General; for the American Center for Law and Justice et al. by Jay Alan Sekulow, Colby M. May, Ben Bull, James M. Henderson, Joel H. Thornton, John P. Tuskey, and Laura B. Hernandez; for the American Civil Rights Union by Peter Ferrara; for Cities, Mayors, and County Commissioners by Kelly Shackelford; for the Greenville, South Carolina, Public Library et al. by Kenneth C. Bass III; for the National Law Center for Children and Families et al. by Kristina A. Bullock, Bruce A. Taylor, and Janet M. LaRue; and for Sen. Trent Lott et al. by Brian Fahling, Stephen M. Crampton, and Michael J. DePrimo.

Briefs of amici curiae urging affirmance were filed for the Association of American Publishers, Inc., et al. by R. Bruce Rich, Jonathan Bloom, and John B. Morris, Jr.; for the Brennan Center for Justice by Burt Neuborne, Laura K. Abel, and David S. Udell; for the Cleveland Public Library et al. by David W. Ogden; and for Partnership for Progress on the Digital Divide et al. by Marjorie Heins.

Briefs of amici curiae were filed for the National School Boards Association et al. by Julie Underwood, Naomi Gittins, and Stuart L. Knade; for the Online Policy Group, Inc., et al. by Daniel H. Bromberg and Charles R. A. Morse; and for Jonathan Wallace d/b/a The Ethical Spectacle by Michael B. Green and Jonathan D. Wallace.

the Children's Internet Protection Act (CIPA), 114 Stat. 2763A–335. Under CIPA, a public library may not receive federal assistance to provide Internet access unless it installs software to block images that constitute obscenity or child pornography, and to prevent minors from obtaining access to material that is harmful to them. The District Court held these provisions facially invalid on the ground that they induce public libraries to violate patrons' First Amendment rights. We now reverse.

To help public libraries provide their patrons with Internet access, Congress offers two forms of federal assistance. First, the E-rate program established by the Telecommunications Act of 1996 entitles qualifying libraries to buy Internet access at a discount. 110 Stat. 71, 47 U. S. C. § 254(h)(1)(B). In the year ending June 30, 2002, libraries received $58.5 million in such discounts. Redacted Joint Trial Stipulations of All Parties in Nos. 01–CV–1303, etc. (ED Pa.), ¶ 128, p. 16 (hereinafter Jt. Tr. Stip.). Second, pursuant to the Library Services and Technology Act (LSTA), 110 Stat. 3009–295, as amended, 20 U. S. C. § 9101 *et seq.*, the Institute of Museum and Library Services makes grants to state library administrative agencies to "electronically lin[k] libraries with educational, social, or information services," "assis[t] libraries in accessing information through electronic networks," and "pa[y] costs for libraries to acquire or share computer systems and telecommunications technologies." §§ 9141(a)(1)(B), (C), (E). In fiscal year 2002, Congress appropriated more than $149 million in LSTA grants. Jt. Tr. Stip. ¶ 185, p. 26. These programs have succeeded greatly in bringing Internet access to public libraries: By 2000, 95% of the Nation's libraries provided public Internet access. J. Bertot & C. McClure, Public Libraries and the Internet 2000: Summary Findings and Data Tables, p. 3 (Sept. 7, 2000), http://www.nclis.gov/statsurv/2000plo.pdf (all Internet materials as visited Mar. 25, 2003, and available in Clerk of Court's case file).

By connecting to the Internet, public libraries provide patrons with a vast amount of valuable information. But there is also an enormous amount of pornography on the Internet, much of which is easily obtained. 201 F. Supp. 2d 401, 419 (ED Pa. 2002). The accessibility of this material has created serious problems for libraries, which have found that patrons of all ages, including minors, regularly search for online pornography. *Id.*, at 406. Some patrons also expose others to pornographic images by leaving them displayed on Internet terminals or printed at library printers. *Id.*, at 423.

Upon discovering these problems, Congress became concerned that the E-rate and LSTA programs were facilitating access to illegal and harmful pornography. S. Rep. No. 105–226, p. 5 (1998). Congress learned that adults "us[e] library computers to access pornography that is then exposed to staff, passersby, and children," and that "minors acces[s] child and adult pornography in libraries."[1]

But Congress also learned that filtering software that blocks access to pornographic Web sites could provide a reasonably effective way to prevent such uses of library resources. *Id.*, at 20–26. By 2000, before Congress enacted CIPA, almost 17% of public libraries used such software on at least some of their Internet terminals, and 7% had filters on all of them. Library Research Center of U. Ill., Survey of Internet Access Management in Public Libraries 8, http://alexia.lis.uiuc.edu/gslis/research/internet.pdf. A library can

---

[1] The Children's Internet Protection Act: Hearing on S. 97 before the Senate Committee on Commerce, Science, and Transportation, 106th Cong., 1st Sess., 49 (1999) (prepared statement of Bruce Taylor, President and Chief Counsel, National Law Center for Children and Families). See also Obscene Material Available Via The Internet: Hearing before the Subcommittee on Telecommunications, Trade, and Consumer Protection of the House Committee on Commerce, 106th Cong., 2d Sess., 1, 27 (2000) (citing D. Burt, Dangerous Access, 2000 Edition: Uncovering Internet Pornography in America's Libraries (2000)) (noting more than 2,000 incidents of patrons, both adults and minors, using library computers to view online pornography, including obscenity and child pornography).

set such software to block categories of material, such as "Pornography" or "Violence." 201 F. Supp. 2d, at 428. When a patron tries to view a site that falls within such a category, a screen appears indicating that the site is blocked. *Id.*, at 429. But a filter set to block pornography may sometimes block other sites that present neither obscene nor pornographic material, but that nevertheless trigger the filter. To minimize this problem, a library can set its software to prevent the blocking of material that falls into categories like "Education," "History," and "Medical." *Id.*, at 428–429. A library may also add or delete specific sites from a blocking category, *id.*, at 429, and anyone can ask companies that furnish filtering software to unblock particular sites, *id.*, at 430.

Responding to this information, Congress enacted CIPA. It provides that a library may not receive E-rate or LSTA assistance unless it has "a policy of Internet safety for minors that includes the operation of a technology protection measure . . . that protects against access" by all persons to "visual depictions" that constitute "obscen[ity]" or "child pornography," and that protects against access by minors to "visual depictions" that are "harmful to minors." 20 U. S. C. §§ 9134(f)(1)(A)(i) and (B)(i); 47 U. S. C. §§ 254(h)(6)(B)(i) and (C)(i). The statute defines a "[t]echnology protection measure" as "a specific technology that blocks or filters Internet access to material covered by" CIPA. § 254(h)(7)(I). CIPA also permits the library to "disable" the filter "to enable access for bona fide research or other lawful purposes." 20 U. S. C. § 9134(f)(3); 47 U. S. C. § 254(h)(6)(D). Under the E-rate program, disabling is permitted "during use by an adult." § 254(h)(6)(D). Under the LSTA program, disabling is permitted during use by any person. 20 U. S. C. § 9134(f)(3).

Appellees are a group of libraries, library associations, library patrons, and Web site publishers, including the American Library Association (ALA) and the Multnomah County Public Library in Portland, Oregon (Multnomah). They

sued the United States and the Government agencies and officials responsible for administering the E-rate and LSTA programs in District Court, challenging the constitutionality of CIPA's filtering provisions. A three-judge District Court convened pursuant to § 1741(a) of CIPA, 114 Stat. 2763A–351, note following 20 U. S. C. § 7001.

After a trial, the District Court ruled that CIPA was facially unconstitutional and enjoined the relevant agencies and officials from withholding federal assistance for failure to comply with CIPA. The District Court held that Congress had exceeded its authority under the Spending Clause, U. S. Const., Art. I, § 8, cl. 1, because, in the court's view, "any public library that complies with CIPA's conditions will necessarily violate the First Amendment." 201 F. Supp. 2d, at 453. The court acknowledged that "generally the First Amendment subjects libraries' content-based decisions about which print materials to acquire for their collections to only rational [basis] review." *Id.*, at 462. But it distinguished libraries' decisions to make certain Internet material inaccessible. "The central difference," the court stated, "is that by providing patrons with even filtered Internet access, the library permits patrons to receive speech on a virtually unlimited number of topics, from a virtually unlimited number of speakers, without attempting to restrict patrons' access to speech that the library, in the exercise of its professional judgment, determines to be particularly valuable." *Ibid.* Reasoning that "the provision of Internet access within a public library . . . is for use by the public . . . for expressive activity," the court analyzed such access as a "designated public forum." *Id.*, at 457 (citation and internal quotation marks omitted). The District Court also likened Internet access in libraries to "traditional public fora . . . such as sidewalks and parks" because it "promotes First Amendment values in an analogous manner." *Id.*, at 466.

Based on both of these grounds, the court held that the filtering software contemplated by CIPA was a content-

based restriction on access to a public forum, and was therefore subject to strict scrutiny. *Ibid.* Applying this standard, the District Court held that, although the Government has a compelling interest "in preventing the dissemination of obscenity, child pornography, or, in the case of minors, material harmful to minors," *id.*, at 471, the use of software filters is not narrowly tailored to further those interests, *id.*, at 479. We noted probable jurisdiction, 537 U. S. 1017 (2002), and now reverse.

Congress has wide latitude to attach conditions to the receipt of federal assistance in order to further its policy objectives. *South Dakota* v. *Dole,* 483 U. S. 203, 206 (1987). But Congress may not "induce" the recipient "to engage in activities that would themselves be unconstitutional." *Id.,* at 210. To determine whether libraries would violate the First Amendment by employing the filtering software that CIPA requires,[2] we must first examine the role of libraries in our society.

Public libraries pursue the worthy missions of facilitating learning and cultural enrichment. Appellee ALA's Library Bill of Rights states that libraries should provide "[b]ooks and other . . . resources . . . for the interest, information, and enlightenment of all people of the community the library

---

[2] JUSTICE STEVENS misapprehends the analysis we must perform to determine whether CIPA exceeds Congress' authority under the Spending Clause. He asks and answers whether it is constitutional for Congress to "impose [CIPA's filtering] requirement" on public libraries, instead of "allowing local decisionmakers to tailor their responses to local problems." *Post,* at 220 (dissenting opinion). But under our well-established Spending Clause precedent, that is not the proper inquiry. Rather, as the District Court correctly recognized, 201 F. Supp. 2d 401, 453 (ED Pa. 2002), we must ask whether the condition that Congress requires "would . . . be unconstitutional" if performed by the library itself. *Dole,* 483 U. S., at 210.

CIPA does not directly regulate private conduct; rather, Congress has exercised its Spending Power by specifying conditions on the receipt of federal funds. Therefore, *Dole* provides the appropriate framework for assessing CIPA's constitutionality.

serves." 201 F. Supp. 2d, at 420 (internal quotation marks omitted). To fulfill their traditional missions, public libraries must have broad discretion to decide what material to provide to their patrons. Although they seek to provide a wide array of information, their goal has never been to provide "universal coverage." *Id.*, at 421. Instead, public libraries seek to provide materials "that would be of the greatest direct benefit or interest to the community." *Ibid.* To this end, libraries collect only those materials deemed to have "requisite and appropriate quality." *Ibid.* See W. Katz, Collection Development: The Selection of Materials for Libraries 6 (1980) ("The librarian's responsibility . . . is to separate out the gold from the garbage, not to preserve everything"); F. Drury, Book Selection xi (1930) ("[I]t is the aim of the selector to give the public, not everything it wants, but the best that it will read or use to advantage"); App. 636 (Rebuttal Expert Report of Donald G. Davis, Jr.) ("A hypothetical collection of everything that has been produced is not only of dubious value, but actually detrimental to users trying to find what they want to find and really need").

We have held in two analogous contexts that the government has broad discretion to make content-based judgments in deciding what private speech to make available to the public. In *Arkansas Ed. Television Comm'n* v. *Forbes,* 523 U. S. 666, 672–673 (1998), we held that public forum principles do not generally apply to a public television station's editorial judgments regarding the private speech it presents to its viewers. "[B]road rights of access for outside speakers would be antithetical, as a general rule, to the discretion that stations and their editorial staff must exercise to fulfill their journalistic purpose and statutory obligations." *Id.*, at 673. Recognizing a broad right of public access "would [also] risk implicating the courts in judgments that should be left to the exercise of journalistic discretion." *Id.*, at 674.

Similarly, in *National Endowment for Arts* v. *Finley*, 524 U. S. 569 (1998), we upheld an art funding program that required the National Endowment for the Arts (NEA) to use content-based criteria in making funding decisions. We explained that "[a]ny content-based considerations that may be taken into account in the grant-making process are a consequence of the nature of arts funding." *Id.,* at 585. In particular, "[t]he very assumption of the NEA is that grants will be awarded according to the 'artistic worth of competing applicants,' and absolute neutrality is simply inconceivable." *Ibid.* (some internal quotation marks omitted). We expressly declined to apply forum analysis, reasoning that it would conflict with "NEA's mandate . . . to make esthetic judgments, and the inherently content-based 'excellence' threshold for NEA support." *Id.,* at 586.

The principles underlying *Forbes* and *Finley* also apply to a public library's exercise of judgment in selecting the material it provides to its patrons. Just as forum analysis and heightened judicial scrutiny are incompatible with the role of public television stations and the role of the NEA, they are also incompatible with the discretion that public libraries must have to fulfill their traditional missions. Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them.

The public forum principles on which the District Court relied, 201 F. Supp. 2d, at 457–470, are out of place in the context of this case. Internet access in public libraries is neither a "traditional" nor a "designated" public forum. See *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.,* 473 U. S. 788, 802 (1985) (describing types of forums). First, this resource—which did not exist until quite recently—has not "immemorially been held in trust for the use of the public and, time out of mind, . . . been used for purposes of assembly, communication of thoughts between citizens, and discussing public questions." *International Soc. for Krishna Consciousness, Inc.* v. *Lee,* 505 U. S. 672, 679 (1992) (internal quo-

tation marks omitted). We have "rejected the view that traditional public forum status extends beyond its historic confines." *Forbes, supra,* at 678. The doctrines surrounding traditional public forums may not be extended to situations where such history is lacking.

Nor does Internet access in a public library satisfy our definition of a "designated public forum." To create such a forum, the government must make an affirmative choice to open up its property for use as a public forum. *Cornelius, supra,* at 802–803; *Perry Ed. Assn.* v. *Perry Local Educators' Assn.,* 460 U. S. 37, 45 (1983). "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius, supra,* at 802. The District Court likened public libraries' Internet terminals to the forum at issue in *Rosenberger* v. *Rector and Visitors of Univ. of Va.,* 515 U. S. 819 (1995). 201 F. Supp. 2d, at 465. In *Rosenberger,* we considered the "Student Activity Fund" established by the University of Virginia that subsidized all manner of student publications except those based on religion. We held that the fund had created a limited public forum by giving public money to student groups who wished to publish, and therefore could not discriminate on the basis of viewpoint.

The situation here is very different. A public library does not acquire Internet terminals in order to create a public forum for Web publishers to express themselves, any more than it collects books in order to provide a public forum for the authors of books to speak. It provides Internet access, not to "encourage a diversity of views from private speakers," *Rosenberger, supra,* at 834, but for the same reasons it offers other library resources: to facilitate research, learning, and recreational pursuits by furnishing materials of requisite and appropriate quality. See *Cornelius, supra,* at 805 (noting, in upholding limits on participation in the Combined Federal Campaign (CFC), that "[t]he Government did not

create the CFC for purposes of providing a forum for expressive activity"). As Congress recognized, "[t]he Internet is simply another method for making information available in a school or library." S. Rep. No. 106–141, p. 7 (1999). It is "no more than a technological extension of the book stack." *Ibid.*[3]

The District Court disagreed because, whereas a library reviews and affirmatively chooses to acquire every book in its collection, it does not review every Web site that it makes available. 201 F. Supp. 2d, at 462–463. Based on this distinction, the court reasoned that a public library enjoys less discretion in deciding which Internet materials to make

_____

[3] Even if appellees had proffered more persuasive evidence that public libraries intended to create a forum for speech by connecting to the Internet, we would hesitate to import "the public forum doctrine . . . wholesale into" the context of the Internet. *Denver Area Ed. Telecommunications Consortium, Inc.* v. *FCC*, 518 U. S. 727, 749 (1996) (opinion of BREYER, J.). "[W]e are wary of the notion that a partial analogy in one context, for which we have developed doctrines, can compel a full range of decisions in such a new and changing area." *Ibid.*

The dissents agree with the District Court that less restrictive alternatives to filtering software would suffice to meet Congress' goals. *Post*, at 223 (opinion of STEVENS, J.) (quoting 201 F. Supp. 2d, at 410); *post*, at 234 (opinion of SOUTER, J.) (quoting 201 F. Supp. 2d, at 422–427). But we require the Government to employ the least restrictive means only when the forum is a public one and strict scrutiny applies. For the reasons stated above, see *supra*, at 205–208, such is not the case here. In deciding not to collect pornographic material from the Internet, a public library need not satisfy a court that it has pursued the least restrictive means of implementing that decision.

In any case, the suggested alternatives have their own drawbacks. Close monitoring of computer users would be far more intrusive than the use of filtering software, and would risk transforming the role of a librarian from a professional to whom patrons turn for assistance into a compliance officer whom many patrons might wish to avoid. Moving terminals to places where their displays cannot easily be seen by other patrons, or installing privacy screens or recessed monitors, would not address a library's interest in preventing patrons from deliberately using its computers to view online pornography. To the contrary, these alternatives would make it *easier* for patrons to do so.

available than in making book selections. *Ibid.* We do not find this distinction constitutionally relevant. A library's failure to make quality-based judgments about all the material it furnishes from the Web does not somehow taint the judgments it does make. A library's need to exercise judgment in making collection decisions depends on its traditional role in identifying suitable and worthwhile material; it is no less entitled to play that role when it collects material from the Internet than when it collects material from any other source. Most libraries already exclude pornography from their print collections because they deem it inappropriate for inclusion. We do not subject these decisions to heightened scrutiny; it would make little sense to treat libraries' judgments to block online pornography any differently, when these judgments are made for just the same reason.

Moreover, because of the vast quantity of material on the Internet and the rapid pace at which it changes, libraries cannot possibly segregate, item by item, all the Internet material that is appropriate for inclusion from all that is not. While a library could limit its Internet collection to just those sites it found worthwhile, it could do so only at the cost of excluding an enormous amount of valuable information that it lacks the capacity to review. Given that tradeoff, it is entirely reasonable for public libraries to reject that approach and instead exclude certain categories of content, without making individualized judgments that everything they do make available has requisite and appropriate quality.

Like the District Court, the dissents fault the tendency of filtering software to "overblock"—that is, to erroneously block access to constitutionally protected speech that falls outside the categories that software users intend to block. See *post,* at 221–222 (opinion of STEVENS, J.); *post,* at 233–234 (opinion of SOUTER, J.). Due to the software's limitations, "[m]any erroneously blocked [Web] pages contain content

that is completely innocuous for both adults and minors, and that no rational person could conclude matches the filtering companies' category definitions, such as 'pornography' or 'sex.'" 201 F. Supp. 2d, at 449. Assuming that such erroneous blocking presents constitutional difficulties, any such concerns are dispelled by the ease with which patrons may have the filtering software disabled. When a patron encounters a blocked site, he need only ask a librarian to unblock it or (at least in the case of adults) disable the filter. As the District Court found, libraries have the capacity to permanently unblock any erroneously blocked site, *id.*, at 429, and the Solicitor General stated at oral argument that a "library may . . . eliminate the filtering with respect to specific sites . . . at the request of a patron," Tr. of Oral Arg. 4. With respect to adults, CIPA also expressly authorizes library officials to "disable" a filter altogether "to enable access for bona fide research or other lawful purposes." 20 U. S. C. § 9134(f)(3) (disabling permitted for both adults and minors); 47 U. S. C. § 254(h)(6)(D) (disabling permitted for adults). The Solicitor General confirmed that a "librarian can, in response to a request from a patron, unblock the filtering mechanism altogether," Tr. of Oral Arg. 11, and further explained that a patron would not "have to explain . . . why he was asking a site to be unblocked or the filtering to be disabled," *id.*, at 4. The District Court viewed unblocking and disabling as inadequate because some patrons may be too embarrassed to request them. 201 F. Supp. 2d, at 411. But the Constitution does not guarantee the right to acquire information at a public library without any risk of embarrassment.[4]

---

[4] The dissents argue that overblocking will "'reduce the adult population . . . to reading only what is fit for children.'" *Post*, at 222, n. 2 (opinion of STEVENS, J.) (quoting *Butler* v. *Michigan,* 352 U. S. 380, 383 (1957)). See also *post*, at 222, and n. 2 (citing *Ashcroft* v. *Free Speech Coalition,* 535 U. S. 234, 252 (2002); *United States* v. *Playboy Entertainment Group,*

Appellees urge us to affirm the District Court's judgment on the alternative ground that CIPA imposes an unconstitutional condition on the receipt of federal assistance. Under this doctrine, "the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech' even if he has no entitlement to that benefit." *Board of Comm'rs, Wabaunsee Cty.* v. *Umbehr,* 518 U. S. 668, 674 (1996) (quoting *Perry* v. *Sindermann,* 408 U. S. 593, 597 (1972)). Appellees argue that CIPA imposes an unconstitutional condition on libraries that receive E-rate and LSTA subsidies by requiring them, as a condition on their receipt of federal funds, to surrender their First Amendment right to provide the public with access to constitutionally protected speech. The Government counters that this claim fails because Government entities do not have First Amendment rights. See *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94,

---

*Inc.,* 529 U. S. 803, 814 (2000); and *Reno* v. *American Civil Liberties Union,* 521 U. S. 844, 875 (1997)); see *post,* at 237–238 (opinion of SOUTER, J.). But these cases are inapposite because they addressed Congress' direct regulation of private conduct, not exercises of its Spending Power.

The dissents also argue that because some library patrons would not make specific unblocking requests, the interest of authors of blocked Internet material "in reaching the widest possible audience would be abridged." *Post,* at 225 (opinion of STEVENS, J.); see *post,* at 242–243, n. 8 (opinion of SOUTER, J.). But this mistakes a public library's purpose for acquiring Internet terminals: A library does so to provide its patrons with materials of requisite and appropriate quality, not to create a public forum for Web publishers to express themselves. See *supra,* at 206–208.

JUSTICE STEVENS further argues that, because some libraries' procedures will make it difficult for patrons to have blocked material unblocked, CIPA "will create a significant prior restraint on adult access to protected speech." *Post,* at 225. But this argument, which the District Court did not address, mistakenly extends prior restraint doctrine to the context of public libraries' collection decisions. A library's decision to use filtering software is a collection decision, not a restraint on private speech. Contrary to JUSTICE STEVENS' belief, a public library does not have an obligation to add material to its collection simply because the material is constitutionally protected.

139 (1973) (Stewart, J., concurring) ("The First Amendment protects the press *from* governmental interference; it confers no analogous protection *on* the government"); *id.*, at 139, n. 7 ("'The purpose of the First Amendment is to protect private expression'" (quoting T. Emerson, The System of Freedom of Expression 700 (1970))).  See also *Warner Cable Communications, Inc.,* v. *Niceville,* 911 F. 2d 634, 638 (CA11 1990); *Student Govt. Assn.* v. *Board of Trustees of the Univ. of Mass.,* 868 F. 2d 473, 481 (CA1 1989); *Estiverne* v. *Louisiana State Bar Assn.,* 863 F. 2d 371, 379 (CA5 1989).

We need not decide this question because, even assuming that appellees may assert an "unconstitutional conditions" claim, this claim would fail on the merits.  Within broad limits, "when the Government appropriates public funds to establish a program it is entitled to define the limits of that program." *Rust* v. *Sullivan,* 500 U. S. 173, 194 (1991).  In *Rust,* Congress had appropriated federal funding for family planning services and forbidden the use of such funds in programs that provided abortion counseling. *Id.,* at 178.  Recipients of these funds challenged this restriction, arguing that it impermissibly conditioned the receipt of a benefit on the relinquishment of their constitutional right to engage in abortion counseling. *Id.,* at 196.  We rejected that claim, recognizing that "the Government [was] not denying a benefit to anyone, but [was] instead simply insisting that public funds be spent for the purposes for which they were authorized." *Ibid.*

The same is true here.  The E-rate and LSTA programs were intended to help public libraries fulfill their traditional role of obtaining material of requisite and appropriate quality for educational and informational purposes.[5]  Congress

---

[5] See 20 U. S. C. § 9121 ("It is the purpose of [LSTA] (2) to stimulate excellence and promote access to learning and information resources in all types of libraries for individuals of all ages"); S. Conf. Rep. No. 104–230, p. 132 (1996) (The E-rate program "will help open new worlds of knowledge, learning and education to all Americans . . . . [It is] intended, for

may certainly insist that these "public funds be spent for the purposes for which they were authorized." *Ibid.* Especially because public libraries have traditionally excluded pornographic material from their other collections, Congress could reasonably impose a parallel limitation on its Internet assistance programs. As the use of filtering software helps to carry out these programs, it is a permissible condition under *Rust.*

JUSTICE STEVENS asserts the premise that "[a] federal statute penalizing a library for failing to install filtering software on every one of its Internet-accessible computers would unquestionably violate [the First] Amendment." *Post,* at 226. See also *post,* at 230–231. But—assuming again that public libraries have First Amendment rights—CIPA does not "penalize" libraries that choose not to install such software, or deny them the right to provide their patrons with unfiltered Internet access. Rather, CIPA simply reflects Congress' decision not to subsidize their doing so. To the extent that libraries wish to offer unfiltered access, they are free to do so without federal assistance. " 'A refusal to fund protected activity, without more, cannot be equated with the imposition of a "penalty" on that activity.' " *Rust, supra,* at 193 (quoting *Harris* v. *McRae,* 448 U. S. 297, 317, n. 19 (1980)). " '[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right.' " *Rust, supra,* at 193 (quoting *Regan* v. *Taxation With Representation of Wash.,* 461 U. S. 540, 549 (1983)).[6]

---

example, to provide the ability to browse library collections, review the collections of museums, or find new information on the treatment of an illness, to Americans everywhere via . . . libraries").

[6] These holdings, which JUSTICE STEVENS ignores, also make clear that his reliance on *Rutan* v. *Republican Party of Ill.,* 497 U. S. 62 (1990), *Elrod* v. *Burns,* 427 U. S. 347 (1976), and *Wieman* v. *Updegraff,* 344 U. S. 183 (1952), is misplaced. See *post,* at 227. The invalidated state action in those cases involved true penalties, such as denial of a promotion or outright discharge from employment, not nonsubsidies.

Appellees mistakenly contend, in reliance on *Legal Services Corporation* v. *Velazquez*, 531 U. S. 533 (2001), that CIPA's filtering conditions "[d]istor[t] the [u]sual [f]unctioning of [p]ublic [l]ibraries." Brief for Appellees ALA et al. 40 (citing *Velazquez, supra,* at 543); Brief for Appellees Multnomah et al. 47–48 (same). In *Velazquez,* the Court concluded that a Government program of furnishing legal aid to the indigent differed from the program in *Rust* "[i]n th[e] vital respect" that the role of lawyers who represent clients in welfare disputes is to advocate *against* the Government, and there was thus an assumption that counsel would be free of state control. 531 U. S., at 542–543. The Court concluded that the restriction on advocacy in such welfare disputes would distort the usual functioning of the legal profession and the federal and state courts before which the lawyers appeared. Public libraries, by contrast, have no comparable role that pits them against the Government, and there is no comparable assumption that they must be free of any conditions that their benefactors might attach to the use of donated funds or other assistance.[7]

---

[7] Relying on *Velazquez,* JUSTICE STEVENS argues mistakenly that *Rust* is inapposite because that case "only involved, and only applies to, . . . situations in which the government seeks to communicate a specific message," *post,* at 228, and unlike the Title X program in *Rust,* the E-rate and LSTA programs "are not designed to foster or transmit any particular governmental message." *Post,* at 229. But he misreads our cases discussing *Rust,* and again misapprehends the purpose of providing Internet terminals in public libraries. *Velazquez* held only that viewpoint-based restrictions are improper "'when the [government] does not itself speak or subsidize transmittal of a message it favors *but instead expends funds to encourage a diversity of views from private speakers.'*" 531 U. S., at 542 (quoting *Rosenberger* v. *Rector and Visitors of Univ. of Va.,* 515 U. S. 819, 834 (1995) (emphasis added)). See also 531 U. S., at 542 ("[T]he salient point is that, like the program in *Rosenberger,* the LSC [Legal Services Corporation] program was designed *to facilitate private speech* . . ." (emphasis added)); *Board of Regents of Univ. of Wis. System* v. *Southworth,* 529 U. S. 217, 229 (2000) ("The University of Wisconsin

Because public libraries' use of Internet filtering software does not violate their patrons' First Amendment rights, CIPA does not induce libraries to violate the Constitution, and is a valid exercise of Congress' spending power. Nor does CIPA impose an unconstitutional condition on public libraries. Therefore, the judgment of the District Court for the Eastern District of Pennsylvania is

*Reversed.*

JUSTICE KENNEDY, concurring in the judgment.

If, on the request of an adult user, a librarian will unblock filtered material or disable the Internet software filter without significant delay, there is little to this case. The Government represents this is indeed the fact. Tr. of Oral Arg. 11; *ante*, at 209 (plurality opinion).

The District Court, in its "Preliminary Statement," did say that "the unblocking may take days, and may be unavailable, especially in branch libraries, which are often less well staffed than main libraries." 201 F. Supp. 2d 401, 411 (ED Pa. 2002). See also *post*, at 232–233 (SOUTER, J., dissenting). That statement, however, does not appear to be a specific finding. It was not the basis for the District Court's decision in any event, as the court assumed that "the disabling provisions permit public libraries to allow a patron access to any speech that is constitutionally protected with respect to that patron." 201 F. Supp. 2d, at 485–486.

---

exacts the fee at issue for the sole purpose of facilitating the free and open exchange of ideas"); *Rosenberger, supra,* at 830, 834 ("The [Student Activities Fund] is a forum"; "[T]he University . . . expends funds to encourage a diversity of views from private speakers"). Indeed, this very distinction led us to state in *Southworth* that that case did not implicate our unconstitutional conditions jurisprudence. 529 U. S., at 229 ("The case we decide here . . . does not raise the issue of the government's right . . . to use its own funds to advance a particular message"). As we have stated above, *supra*, at 206–208, public libraries do not install Internet terminals to provide a forum for Web publishers to express themselves, but rather to provide patrons with online material of requisite and appropriate quality.

If some libraries do not have the capacity to unblock specific Web sites or to disable the filter or if it is shown that an adult user's election to view constitutionally protected Internet material is burdened in some other substantial way, that would be the subject for an as-applied challenge, not the facial challenge made in this case. See *post*, at 219–220 (BREYER, J., concurring in judgment).

There are, of course, substantial Government interests at stake here. The interest in protecting young library users from material inappropriate for minors is legitimate, and even compelling, as all Members of the Court appear to agree. Given this interest, and the failure to show that the ability of adult library users to have access to the material is burdened in any significant degree, the statute is not unconstitutional on its face. For these reasons, I concur in the judgment of the Court.

JUSTICE BREYER, concurring in the judgment.

The Children's Internet Protection Act (Act) sets conditions for the receipt of certain Government subsidies by public libraries. Those conditions require the libraries to install on their Internet-accessible computers technology, say, filtering software, that will help prevent computer users from gaining Internet access to child pornography, obscenity, or material comparably harmful to minors. 20 U. S. C. §§ 9134(f)(1)(A)(i) and (B)(i); 47 U. S. C. §§ 254(h)(6)(B)(i) and (C)(i). The technology, in its current form, does not function perfectly, for to some extent it also screens out constitutionally protected materials that fall outside the scope of the statute (*i. e.*, "overblocks") and fails to prevent access to some materials that the statute deems harmful (*i. e.*, "underblocks"). See 201 F. Supp. 2d 401, 448–449 (ED Pa. 2002); *ante*, at 208–209 (plurality opinion). In determining whether the statute's conditions consequently violate the First Amendment, the plurality first finds the "public forum" doctrine inapplicable, *ante*, at 205–208, and then holds that the statutory provisions are constitutional. I agree with

both determinations. But I reach the plurality's ultimate conclusion in a different way.

In ascertaining whether the statutory provisions are constitutional, I would apply a form of heightened scrutiny, examining the statutory requirements in question with special care. The Act directly restricts the public's receipt of information. See *Stanley* v. *Georgia,* 394 U. S. 557, 564 (1969) ("[T]he Constitution protects the right to receive information and ideas"); *Reno* v. *American Civil Liberties Union,* 521 U. S. 844, 874 (1997). And it does so through limitations imposed by outside bodies (here Congress) upon two critically important sources of information—the Internet as accessed via public libraries. See *ante,* at 200, 203–204 (plurality opinion); *post,* at 225–226 (STEVENS, J., dissenting); *Board of Ed., Island Trees Union Free School Dist. No. 26* v. *Pico,* 457 U. S. 853, 915 (1982) (REHNQUIST, J., dissenting) (describing public libraries as places "designed for freewheeling inquiry"). See also *Reno, supra,* at 853, 868 (describing the Internet as a "vast democratic" medium and the World Wide Web, in part, as "comparable, from the readers' viewpoint, to . . . a vast library"); *Ashcroft* v. *American Civil Liberties Union,* 535 U. S. 564, 566 (2002). For that reason, we should not examine the statute's constitutionality as if it raised no special First Amendment concern—as if, like tax or economic regulation, the First Amendment demanded only a "rational basis" for imposing a restriction. Nor should we accept the Government's suggestion that a presumption in favor of the statute's constitutionality applies. See, *e. g.,* 201 F. Supp. 2d, at 409; Brief for United States 21–24.

At the same time, in my view, the First Amendment does not here demand application of the most limiting constitutional approach—that of "strict scrutiny." The statutory restriction in question is, in essence, a kind of "selection" restriction (a kind of editing). It affects the kinds and amount of materials that the library can present to its pa-

trons. See *ante,* at 204, 207–208 (plurality opinion). And libraries often properly engage in the selection of materials, either as a matter of necessity (*i. e.,* due to the scarcity of resources) or by design (*i. e.,* in accordance with collection development policies). See, *e. g.,* 201 F. Supp. 2d, at 408–409, 421, 462; *ante,* at 204, 208 (plurality opinion). To apply "strict scrutiny" to the "selection" of a library's collection (whether carried out by public libraries themselves or by other community bodies with a traditional legal right to engage in that function) would unreasonably interfere with the discretion necessary to create, maintain, or select a library's "collection" (broadly defined to include all the information the library makes available). Cf. *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241, 256–258 (1974) (protecting newspaper's exercise of editorial control and judgment). That is to say, "strict scrutiny" implies too limiting and rigid a test for me to believe that the First Amendment requires it in this context.

Instead, I would examine the constitutionality of the Act's restrictions here as the Court has examined speech-related restrictions in other contexts where circumstances call for heightened, but not "strict," scrutiny—where, for example, complex, competing constitutional interests are potentially at issue or speech-related harm is potentially justified by unusually strong governmental interests. Typically the key question in such instances is one of proper fit. See, *e. g., Board of Trustees of State Univ. of N. Y.* v. *Fox,* 492 U. S. 469 (1989); *Denver Area Ed. Telecommunications Consortium, Inc.* v. *FCC,* 518 U. S. 727, 740–747 (1996) (plurality opinion); *Turner Broadcasting System, Inc.* v. *FCC,* 520 U. S. 180, 227 (1997) (BREYER, J., concurring in part); *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 389–390 (1969).

In such cases the Court has asked whether the harm to speech-related interests is disproportionate in light of both the justifications and the potential alternatives. It has considered the legitimacy of the statute's objective, the extent

to which the statute will tend to achieve that objective, whether there are other, less restrictive ways of achieving that objective, and ultimately whether the statute works speech-related harm that, in relation to that objective, is out of proportion. In *Fox, supra,* at 480, for example, the Court stated:

> "What our decisions require is a 'fit' between the legislature's ends and the means chosen to accomplish those ends—a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served; that employs not necessarily the least restrictive means but, as we have put it in the other contexts . . . , a means narrowly tailored to achieve the desired objective." (Internal quotation marks and citations omitted.)

Cf., *e. g., Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.,* 447 U. S. 557, 564 (1980); *United States* v. *O'Brien,* 391 U. S. 367, 377 (1968); *Clark* v. *Community for Creative Non-Violence,* 468 U. S. 288, 293 (1984). This approach does not substitute a form of "balancing" for less flexible, though more speech-protective, forms of "strict scrutiny." Rather, it *supplements* the latter with an approach that is more flexible but nonetheless provides the legislature with less than ordinary leeway in light of the fact that constitutionally protected expression is at issue. Cf. *Fox, supra,* at 480–481; *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748, 769–773 (1976).

The Act's restrictions satisfy these constitutional demands. The Act seeks to restrict access to obscenity, child pornography, and, in respect to access by minors, material that is comparably harmful. These objectives are "legitimate," and indeed often "compelling." See, *e. g., Miller* v. *California,* 413 U. S. 15, 18 (1973) (interest in prohibiting access to

obscene material is "legitimate"); *Reno*, 521 U. S., at 869–870 (interest in "shielding" minors from exposure to indecent material is "'compelling'"); *New York* v. *Ferber*, 458 U. S. 747, 756–757 (1982) (same). As the District Court found, software filters "provide a relatively cheap and effective" means of furthering these goals. 201 F. Supp. 2d, at 448. Due to present technological limitations, however, the software filters both "overblock," screening out some perfectly legitimate material, and "underblock," allowing some obscene material to escape detection by the filter. *Id.*, at 448–449. See *ante*, at 208–209 (plurality opinion). But no one has presented any clearly superior or better fitting alternatives. See *ante*, at 207, n. 3 (plurality opinion).

At the same time, the Act contains an important exception that limits the speech-related harm that "overblocking" might cause. As the plurality points out, the Act allows libraries to permit any adult patron access to an "over-blocked" Web site; the adult patron need only ask a librarian to unblock the specific Web site or, alternatively, ask the librarian, "Please disable the entire filter." See *ante*, at 209; 20 U. S. C. § 9134(f)(3) (permitting library officials to "disable a technology protection measure . . . to enable access for bona fide research or other lawful purposes"); 47 U. S. C. § 254(h)(6)(D) (same).

The Act does impose upon the patron the burden of making this request. But it is difficult to see how that burden (or any delay associated with compliance) could prove more onerous than traditional library practices associated with segregating library materials in, say, closed stacks, or with interlibrary lending practices that require patrons to make requests that are not anonymous and to wait while the librarian obtains the desired materials from elsewhere. Perhaps local library rules or practices could further restrict the ability of patrons to obtain "overblocked" Internet material. See, *e. g., In re Federal-State Joint Board on Universal Service: Children's Internet Protection Act*, 16 FCC Rcd.

8182, 8183, ¶ 2, 8204, ¶ 53 (2001) (leaving determinations regarding the appropriateness of compliant Internet safety policies and their disabling to local communities). But we are not now considering any such local practices. We here consider only a facial challenge to the Act itself.

Given the comparatively small burden that the Act imposes upon the library patron seeking legitimate Internet materials, I cannot say that any speech-related harm that the Act may cause is disproportionate when considered in relation to the Act's legitimate objectives. I therefore agree with the plurality that the statute does not violate the First Amendment, and I concur in the judgment.

JUSTICE STEVENS, dissenting.

"To fulfill their traditional missions, public libraries must have broad discretion to decide what material to provide their patrons." *Ante*, at 204. Accordingly, I agree with the plurality that it is neither inappropriate nor unconstitutional for a local library to experiment with filtering software as a means of curtailing children's access to Internet Web sites displaying sexually explicit images. I also agree with the plurality that the 7% of public libraries that decided to use such software on *all* of their Internet terminals in 2000 did not act unlawfully. *Ante*, at 200. Whether it is constitutional for the Congress of the United States to impose that requirement on the other 93%, however, raises a vastly different question. Rather than allowing local decisionmakers to tailor their responses to local problems, the Children's Internet Protection Act (CIPA) operates as a blunt nationwide restraint on adult access to "an enormous amount of valuable information" that individual librarians cannot possibly review. *Ante*, at 208. Most of that information is constitutionally protected speech. In my view, this restraint is unconstitutional.

## I

The unchallenged findings of fact made by the District Court reveal fundamental defects in the filtering software that is now available or that will be available in the foreseeable future. Because the software relies on key words or phrases to block undesirable sites, it does not have the capacity to exclude a precisely defined category of images. As the District Court explained:

"[T]he search engines that software companies use for harvesting are able to search text only, not images. This is of critical importance, because CIPA, by its own terms, covers only 'visual depictions.' 20 U. S. C. § 9134(f)(1)(A)(i); 47 U. S. C. § 254(h)(5)(B)(i). Image recognition technology is immature, ineffective, and unlikely to improve substantially in the near future. None of the filtering software companies deposed in this case employs image recognition technology when harvesting or categorizing URLs. Due to the reliance on automated text analysis and the absence of image recognition technology, a Web page with sexually explicit images and no text cannot be harvested using a search engine. This problem is complicated by the fact that Web site publishers may use image files rather than text to represent words, i. e., they may use a file that computers understand to be a picture, like a photograph of a printed word, rather than regular text, making automated review of their textual content impossible. For example, if the Playboy Web site displays its name using a logo rather than regular text, a search engine would not see or recognize the Playboy name in that logo." 201 F. Supp. 2d 401, 431–432 (ED Pa. 2002).

Given the quantity and ever-changing character of Web sites offering free sexually explicit material,[1] it is inevitable that a substantial amount of such material will never be blocked. Because of this "underblocking," the statute will provide parents with a false sense of security without really solving the problem that motivated its enactment. Conversely, the software's reliance on words to identify undesirable sites necessarily results in the blocking of thousands of pages that "contain content that is completely innocuous for both adults and minors, and that no rational person could conclude matches the filtering companies' category definitions, such as 'pornography' or 'sex.'" *Id.*, at 449. In my judgment, a statutory blunderbuss that mandates this vast amount of "overblocking" abridges the freedom of speech protected by the First Amendment.

The effect of the overblocking is the functional equivalent of a host of individual decisions excluding hundreds of thousands of individual constitutionally protected messages from Internet terminals located in public libraries throughout the Nation. Neither the interest in suppressing unlawful speech nor the interest in protecting children from access to harmful materials justifies this overly broad restriction on adult access to protected speech. "The Government may not suppress lawful speech as the means to suppress unlawful speech." *Ashcroft* v. *Free Speech Coalition,* 535 U. S. 234, 255 (2002).[2]

---

[1] "The percentage of Web pages on the indexed Web containing sexually explicit content is relatively small. Recent estimates indicate that no more than 1–2% of the content on the Web is pornographic or sexually explicit. However, the absolute number of Web sites offering free sexually explicit material is extremely large, approximately 100,000 sites." 201 F. Supp. 2d 401, 419 (ED Pa. 2002).

[2] We have repeatedly reaffirmed the holding in *Butler* v. *Michigan,* 352 U. S. 380, 383 (1957), that the State may not "reduce the adult population . . . to reading only what is fit for children." See *Ashcroft* v. *Free Speech Coalition,* 535 U. S., at 252; *United States* v. *Playboy Entertainment Group, Inc.,* 529 U. S. 803, 814 (2000) ("[T]he objective of shielding chil-

Although CIPA does not permit any experimentation, the District Court expressly found that a variety of alternatives less restrictive are available at the local level:

"[L]ess restrictive alternatives exist that further the government's legitimate interest in preventing the dissemination of obscenity, child pornography, and material harmful to minors, and in preventing patrons from being unwillingly exposed to patently offensive, sexually explicit content. To prevent patrons from accessing visual depictions that are obscene and child pornography, public libraries may enforce Internet use policies that make clear to patrons that the library's Internet terminals may not be used to access illegal speech. Libraries may then impose penalties on patrons who violate these policies, ranging from a warning to notification of law enforcement, in the appropriate case. Less restrictive alternatives to filtering that further libraries' interest in preventing minors from exposure to visual depictions that are harmful to minors include requiring parental consent to or presence during unfiltered access, or restricting minors' unfiltered access to terminals within view of library staff. Finally, optional filtering, privacy screens, recessed monitors, and placement of unfiltered Internet terminals outside of sight-lines provide less restrictive alternatives for libraries to prevent patrons from being unwillingly exposed to sexually explicit content on the Internet." 201 F. Supp. 2d, at 410.

Those findings are consistent with scholarly comment on the issue arguing that local decisions tailored to local circumstances are more appropriate than a mandate from Con-

dren does not suffice to support a blanket ban if the protection can be accomplished by a less restrictive alternative"); *Reno* v. *American Civil Liberties Union,* 521 U. S. 844, 875 (1997) ("[T]he governmental interest in protecting children from harmful materials . . . does not justify an unnecessarily broad suppression of speech addressed to adults").

gress.[3]  The plurality does not reject any of those findings. Instead, "[a]ssuming that such erroneous blocking presents constitutional difficulties," it relies on the Solicitor General's assurance that the statute permits individual librarians to disable filtering mechanisms whenever a patron so requests. *Ante*, at 209.  In my judgment, that assurance does not cure the constitutional infirmity in the statute.

Until a blocked site or group of sites is unblocked, a patron is unlikely to know what is being hidden and therefore whether there is any point in asking for the filter to be removed.  It is as though the statute required a significant part of every library's reading materials to be kept in unmarked, locked rooms or cabinets, which could be opened only in response to specific requests.  Some curious readers would in time obtain access to the hidden materials, but

---

[3] "Indeed, federal or state mandates in this area are unnecessary and unwise.  Locally designed solutions are likely to best meet local circumstances.  Local decision makers and library boards, responding to local concerns and the prevalence of the problem in their own libraries, should decide if minors' Internet access requires filters.  They are the persons in the best position to judge local community standards for what is and is not obscene, as required by the *Miller* [v. *California*, 413 U. S. 15 (1973)] test.  Indeed, one nationwide solution is not needed, as the problems are local and, to some extent, uniquely so.  Libraries in rural communities, for instance, have reported much less of a problem than libraries in urban areas.  A library in a rural community with only one or two computers with Internet access may find that even the limited filtering advocated here provides little or no additional benefit.  Further, by allowing the nation's public libraries to develop their own approaches, they may be able to develop a better understanding of what methods work well and what methods add little or nothing, or are even counter-productive.  Imposing a mandatory nationwide solution may well impede developing truly effective approaches that do not violate the First Amendment.  The federal and state governments can best assist this effort by providing libraries with sufficient funding to experiment with a variety of constitutionally permissible approaches." Laughlin, Sex, Lies, and Library Cards: The First Amendment Implications of the Use of Software Filters to Control Access to Internet Pornography in Public Libraries, 51 Drake L. Rev. 213, 279 (2003).

many would not. Inevitably, the interest of the authors of those works in reaching the widest possible audience would be abridged. Moreover, because the procedures that different libraries are likely to adopt to respond to unblocking requests will no doubt vary, it is impossible to measure the aggregate effect of the statute on patrons' access to blocked sites. Unless we assume that the statute is a mere symbolic gesture, we must conclude that it will create a significant prior restraint on adult access to protected speech. A law that prohibits reading without official consent, like a law that prohibits speaking without consent, "constitutes a dramatic departure from our national heritage and constitutional tradition." *Watchtower Bible & Tract Soc. of N. Y., Inc.* v. *Village of Stratton,* 536 U. S. 150, 166 (2002).

## II

The plurality incorrectly argues that the statute does not impose "an unconstitutional condition on public libraries." *Ante,* at 214. On the contrary, it impermissibly conditions the receipt of Government funding on the restriction of significant First Amendment rights.

The plurality explains the "worthy missions" of the public library in facilitating "learning and cultural enrichment." *Ante,* at 203. It then asserts that in order to fulfill these missions, "libraries must have broad discretion to decide what material to provide to their patrons." *Ante,* at 204. Thus the selection decision is the province of the librarians, a province into which we have hesitated to enter:

> "A library's need to exercise judgment in making collection decisions depends on its traditional role in identifying suitable and worthwhile material; it is no less entitled to play that role when it collects material from the Internet than when it collects material from any other source. Most libraries already exclude pornography from their print collections because they deem it inappropriate for inclusion. We do not subject these deci-

sions to heightened scrutiny; it would make little sense to treat libraries' judgments to block online pornography any differently, when these judgments are made for just the same reason." *Ante,* at 208.

As the plurality recognizes, we have always assumed that libraries have discretion when making decisions regarding what to include in, and exclude from, their collections. That discretion is comparable to the " 'business of a university . . . to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.' " *Sweezy* v. *New Hampshire,* 354 U. S. 234, 263 (1957) (Frankfurter, J., concurring in result) (citation omitted).[4] As the District Court found, one of the central purposes of a library is to provide information for educational purposes: " 'Books and other library resources should be provided for the interest, information, and enlightenment of all people of the community the library serves.' " 201 F. Supp. 2d, at 420 (quoting the American Library Association's Library Bill of Rights). Given our Nation's deep commitment "to safeguarding academic freedom" and to the "robust exchange of ideas," *Keyishian* v. *Board of Regents of Univ. of State of N. Y.,* 385 U. S. 589, 603 (1967), a library's exercise of judgment with respect to its collection is entitled to First Amendment protection.

A federal statute penalizing a library for failing to install filtering software on every one of its Internet-accessible computers would unquestionably violate that Amendment. Cf. *Reno* v. *American Civil Liberties Union,* 521 U. S. 844 (1997). I think it equally clear that the First Amendment protects libraries from being denied funds for refusing to

---

[4] See also J. Boyer, Academic Freedom and the Modern University: The Experience of the University of Chicago 95 (2002) ("The right to speak, to write, and to teach freely is a precious right, one that the American research universities over the course of the twentieth century have slowly but surely made central to the very identity of the university in the modern world").

comply with an identical rule. An abridgment of speech by means of a threatened denial of benefits can be just as pernicious as an abridgment by means of a threatened penalty.

Our cases holding that government employment may not be conditioned on the surrender of rights protected by the First Amendment illustrate the point. It has long been settled that "Congress could not 'enact a regulation providing that no Republican, Jew or Negro shall be appointed to federal office, or that no federal employee shall attend Mass or take any active part in missionary work.'" *Wieman* v. *Updegraff*, 344 U. S. 183, 191–192 (1952). Neither discharges, as in *Elrod* v. *Burns*, 427 U. S. 347, 350–351 (1976), nor refusals to hire or promote, as in *Rutan* v. *Republican Party of Ill.*, 497 U. S. 62, 66–67 (1990), are immune from First Amendment scrutiny. Our precedents firmly rejecting "Justice Holmes' famous dictum, that a policeman 'may have a constitutional right to talk politics, but he has no constitutional right to be a policeman,'" *Board of Comm'rs, Wabaunsee Cty.* v. *Umbehr*, 518 U. S. 668, 674 (1996), draw no distinction between the penalty of discharge from one's job and the withholding of the benefit of a new job. The abridgment of First Amendment rights is equally unconstitutional in either context. See *Sherbert* v. *Verner*, 374 U. S. 398, 404 (1963) ("Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine . . . . It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege").

The issue in this case does not involve governmental attempts to control the speech or views of its employees. It involves the use of its treasury to impose controls on an important medium of expression. In an analogous situation, we specifically held that when "the Government seeks to use an existing medium of expression and to control it, in a class of cases, in ways which distort its usual functioning," the distorting restriction must be struck down under the First

Amendment.  *Legal Services Corporation* v. *Velazquez*, 531 U. S. 533, 543 (2001).[5]  The question, then, is whether requiring the filtering software on all Internet-accessible computers distorts that medium.  As I have discussed above, the over- and underblocking of the software does just that.

The plurality argues that the controversial decision in *Rust* v. *Sullivan*, 500 U. S. 173 (1991), requires rejection of appellees' unconstitutional conditions claim.  See *ante*, at 211–212.  But, as subsequent cases have explained, *Rust* only involved, and only applies to, instances of governmental speech—that is, situations in which the government seeks to communicate a specific message.[6]  The discounts under the E-rate program and funding under the Library Services and Technology Act (LSTA) program involved in this case do not subsidize any message favored by the Government.  As Congress made clear, these programs were designed "[t]o help public libraries provide their patrons with Internet access," which in turn "provide[s] patrons with a vast amount of valuable information." *Ante*, at 199, 200.  These programs thus are designed to provide access, particularly for individuals in low-income communities, see 47 U. S. C. § 254(h)(1), to a vast amount and wide variety of private

---

[5] Contrary to the plurality's narrow reading, *Velazquez* is not limited to instances in which the recipient of Government funds might be "pit[ted]" against the Government.  See *ante*, at 213.  To the contrary, we assessed the issue in *Velazquez* by turning to, and harmonizing it with, our prior unconstitutional condition cases in the First Amendment context.  See 531 U. S., at 543–544.

[6] See *id.*, at 541 (distinguishing *Rust* on the ground that "the counseling activities of the doctors . . . amounted to governmental speech"); *Board of Regents of Univ. of Wis. System* v. *Southworth*, 529 U. S. 217, 229 (2000) (unlike *Rust*, "the issue of the government's right . . . to use its own funds to advance a particular message" was not presented); *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 834 (1995) (*Rust* is inapplicable where the government "does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers").

speech. They are not designed to foster or transmit any particular governmental message.

Even if we were to construe the passage of CIPA as modifying the E-rate and LSTA programs such that they now convey a governmental message that no " 'visual depictions' that are 'obscene,' 'child pornography,' or in the case of minors, 'harmful to minors,' " 201 F. Supp. 2d, at 407, should be expressed or viewed, the use of filtering software does not promote that message. As described above, all filtering software erroneously blocks access to a substantial number of Web sites that contain constitutionally protected speech on a wide variety of topics. See *id.*, at 446–447 (describing erroneous blocking of speech on churches and religious groups, on politics and government, on health issues, on education and careers, on sports, and on travel). Moreover, there are "frequent instances of underblocking," *id.*, at 448, that is, instances in which filtering software did not prevent access to Web sites with depictions that fall within what CIPA seeks to block access to. In short, the message conveyed by the use of filtering software is not that all speech except that which is prohibited by CIPA is supported by the Government, but rather that all speech that gets through the software is supported by the Government. And the items that get through the software include some visual depictions that are obscene, some that are child pornography, and some that are harmful to minors, while at the same time the software blocks an enormous amount of speech that is not sexually explicit and certainly does not meet CIPA's definitions of prohibited content. As such, since the message conveyed is far from the message the Government purports to promote—indeed, the material permitted past the filtering software does not seem to have any coherent message—*Rust* is inapposite.

The plurality's reliance on *National Endowment for Arts* v. *Finley*, 524 U. S. 569 (1998), is also misplaced. That case involved a challenge to a statute setting forth the criteria

used by a federal panel of experts administering a federal grant program. Unlike this case, the Federal Government was not seeking to impose restrictions on the administration of a nonfederal program. As explained *supra*, at 228, *Rust* would appear to permit restrictions on a federal program such as the National Endowment for the Arts (NEA) arts grant program at issue in *Finley*.

Further, like a library, the NEA experts in *Finley* had a great deal of discretion to make judgments as to what projects to fund. But unlike this case, *Finley* did not involve a challenge by the NEA to a governmental restriction on its ability to award grants. Instead, the respondents were performance artists who had applied for NEA grants but were denied funding. See 524 U. S., at 577. If this were a case in which library patrons had challenged a library's decision to install and use filtering software, it would be in the same posture as *Finley*. Because it is not, *Finley* does not control this case.

Also unlike *Finley*, the Government does not merely seek to control a library's discretion with respect to computers purchased with Government funds or those computers with Government-discounted Internet access. CIPA requires libraries to install filtering software on *every* computer with Internet access if the library receives *any* discount from the E-rate program or *any* funds from the LSTA program.[7] See 20 U. S. C. § 9134(f)(1); 47 U. S. C. §§ 254(h)(6)(B) and (C). If a library has 10 computers paid for by nonfederal funds and has Internet service for those computers also paid for by nonfederal funds, the library may choose not to put filtering software on any of those 10 computers. Or a library may decide to put filtering software on the 5 computers in its

---

[7] Thus, appellees are not merely challenging a "refusal to fund protected activity, without more," as in *Harris* v. *McRae*, 448 U. S. 297, 317, n. 19 (1980), or a "decision not to subsidize the exercise of a fundamental right," as in *Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540, 549 (1983). They are challenging a restriction that applies to property that they acquired without federal assistance.

children's section. Or a library in an elementary school might choose to put filters on every single one of its 10 computers. But under this statute, if a library attempts to provide Internet service for even *one* computer through an E-rate discount, that library must put filtering software on *all* of its computers with Internet access, not just the one computer with E-rate discount.

This Court should not permit federal funds to be used to enforce this kind of broad restriction of First Amendment rights, particularly when such a restriction is unnecessary to accomplish Congress' stated goal. See *supra,* at 223 (discussing less restrictive alternatives). The abridgment of speech is equally obnoxious whether a rule like this one is enforced by a threat of penalties or by a threat to withhold a benefit.

I would affirm the judgment of the District Court.

JUSTICE SOUTER, with whom JUSTICE GINSBURG joins, dissenting.

I agree in the main with JUSTICE STEVENS, *ante,* at 225–230 and this page (dissenting opinion), that the blocking requirements of the Children's Internet Protection Act, 20 U. S. C. §§ 9134(f)(1)(A)(i) and (B)(i); 47 U. S. C. §§ 254(h)(6)(B)(i) and (C)(i), impose an unconstitutional condition on the Government's subsidies to local libraries for providing access to the Internet. I also agree with the library appellees on a further reason to hold the blocking rule invalid in the exercise of the spending power under Article I, § 8: the rule mandates action by recipient libraries that would violate the First Amendment's guarantee of free speech if the libraries took that action entirely on their own. I respectfully dissent on this further ground.

I

Like the other Members of the Court, I have no doubt about the legitimacy of governmental efforts to put a barrier between child patrons of public libraries and the raw offer-

ings on the Internet otherwise available to them there, and if the only First Amendment interests raised here were those of children, I would uphold application of the Act. We have said that the governmental interest in "shielding" children from exposure to indecent material is "compelling," *Reno* v. *American Civil Liberties Union,* 521 U. S. 844, 869–870 (1997), and I do not think that the awkwardness a child might feel on asking for an unblocked terminal is any such burden as to affect constitutionality.

Nor would I dissent if I agreed with the majority of my colleagues, see *ante,* at 208–209 (plurality opinion); *ante,* at 219 (BREYER, J., concurring in judgment); *ante,* at 214 (KENNEDY, J., concurring in judgment), that an adult library patron could, consistently with the Act, obtain an unblocked terminal simply for the asking. I realize the Solicitor General represented this to be the Government's policy, see Tr. of Oral Arg. 4–5, 11, and if that policy were communicated to every affected library as unequivocally as it was stated to us at argument, local librarians might be able to indulge the unblocking requests of adult patrons to the point of taking the curse off the statute for all practical purposes. But the Federal Communications Commission, in its order implementing the Act, pointedly declined to set a federal policy on when unblocking by local libraries would be appropriate under the statute. See *In re Federal-State Joint Board on Universal Service: Children's Internet Protection Act,* 16 FCC Rcd. 8182, 8204, ¶ 53 (2001) ("Federally-imposed rules directing school and library staff when to disable technology protection measures would likely be overbroad and imprecise, potentially chilling speech, or otherwise confusing schools and libraries about the requirements of the statute. We leave such determinations to the local communities, whom we believe to be most knowledgeable about the varying circumstances of schools or libraries within those communities"). Moreover, the District Court expressly found that "unblocking may take days, and may be unavailable, espe-

cially in branch libraries, which are often less well staffed than main libraries." 201 F. Supp. 2d 401, 411 (ED Pa. 2002); see *id.*, at 487–488 (same).

In any event, we are here to review a statute, and the unblocking provisions simply cannot be construed, even for constitutional avoidance purposes, to say that a library must unblock upon adult request, no conditions imposed and no questions asked. First, the statute says only that a library "may" unblock, not that it must. 20 U. S. C. § 9134(f)(3); see 47 U. S. C. § 254(h)(6)(D). In addition, it allows unblocking only for "bona fide research or other lawful purposes," 20 U. S. C. § 9134(f)(3); see 47 U. S. C. § 254(h)(6)(D), and if the "lawful purposes" criterion means anything that would not subsume and render the "bona fide research" criterion superfluous, it must impose some limit on eligibility for unblocking, see, *e. g., Connecticut Nat. Bank* v. *Germain,* 503 U. S. 249, 253 (1992) ("[C]ourts should disfavor interpretations of statutes that render language superfluous"). There is therefore necessarily some restriction, which is surely made more onerous by the uncertainty of its terms and the generosity of its discretion to library staffs in deciding who gets complete Internet access and who does not. Cf. *Forsyth County* v. *Nationalist Movement,* 505 U. S. 123, 130 (1992) (noting that the First Amendment bars licensing schemes that grant unduly broad discretion to licensing officials, given the potential for such discretion to "becom[e] a means of suppressing a particular point of view" (internal quotation marks omitted)).[1]

We therefore have to take the statute on the understanding that adults will be denied access to a substantial amount of nonobscene material harmful to children but lawful for

---

[1] If the Solicitor General's representation turns out to be honored in the breach by local libraries, it goes without saying that our decision today would not foreclose an as-applied challenge. See also *ante,* at 219–220 (BREYER, J., concurring in judgment); *ante,* at 215 (KENNEDY, J., concurring in judgment).

adult examination, and a substantial quantity of text and pictures harmful to no one. As the plurality concedes, see *ante*, at 208–209, this is the inevitable consequence of the indiscriminate behavior of current filtering mechanisms, which screen out material to an extent known only by the manufacturers of the blocking software, see 201 F. Supp. 2d, at 408 ("The category lists maintained by the blocking programs are considered to be proprietary information, and hence are unavailable to customers or the general public for review, so that public libraries that select categories when implementing filtering software do not really know what they are blocking").

We likewise have to examine the statute on the understanding that the restrictions on adult Internet access have no justification in the object of protecting children. Children could be restricted to blocked terminals, leaving other unblocked terminals in areas restricted to adults and screened from casual glances. And, of course, the statute could simply have provided for unblocking at adult request, with no questions asked. The statute could, in other words, have protected children without blocking access for adults or subjecting adults to anything more than minimal inconvenience, just the way (the record shows) many librarians had been dealing with obscenity and indecency before imposition of the federal conditions. See *id.*, at 422–427. Instead, the Government's funding conditions engage in overkill to a degree illustrated by their refusal to trust even a library's staff with an unblocked terminal, one to which the adult public itself has no access. See *id.*, at 413 (quoting 16 FCC Rcd., at 8196, ¶ 30).

The question for me, then, is whether a local library could itself constitutionally impose these restrictions on the content otherwise available to an adult patron through an Internet connection, at a library terminal provided for public use. The answer is no. A library that chose to block an adult's Internet access to material harmful to children (and

whatever else the undiscriminating filter might interrupt) would be imposing a content-based restriction on communication of material in the library's control that an adult could otherwise lawfully see. This would simply be censorship. True, the censorship would not necessarily extend to every adult, for an intending Internet user might convince a librarian that he was a true researcher or had a "lawful purpose" to obtain everything the library's terminal could provide. But as to those who did not qualify for discretionary unblocking, the censorship would be complete and, like all censorship by an agency of the Government, presumptively invalid owing to strict scrutiny in implementing the Free Speech Clause of the First Amendment. "The policy of the First Amendment favors dissemination of information and opinion, and the guarantees of freedom of speech and press were not designed to prevent the censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential." *Bigelow* v. *Virginia,* 421 U. S. 809, 829 (1975) (internal quotation marks and brackets omitted).

## II

The Court's plurality does not treat blocking affecting adults as censorship, but chooses to describe a library's act in filtering content as simply an instance of the kind of selection from available material that every library (save, perhaps, the Library of Congress) must perform. *Ante,* at 208 ("A library's need to exercise judgment in making collection decisions depends on its traditional role in identifying suitable and worthwhile material; it is no less entitled to play that role when it collects material from the Internet than when it collects material from any other source"). But this position does not hold up.[2]

---

[2] Among other things, the plurality's reasoning ignores the widespread utilization of interlibrary loan systems. See 201 F. Supp. 2d 401, 421 (ED Pa. 2002). With interlibrary loan, virtually any book, say, is effectively

## A

Public libraries are indeed selective in what they acquire to place in their stacks, as they must be. There is only so much money and so much shelf space, and the necessity to choose some material and reject the rest justifies the effort to be selective with an eye to demand, quality, and the object of maintaining the library as a place of civilized enquiry by widely different sorts of people. Selectivity is thus necessary and complex, and these two characteristics explain why review of a library's selection decisions must be limited: the decisions are made all the time, and only in extreme cases could one expect particular choices to reveal impermissible reasons (reasons even the plurality would consider to be illegitimate), like excluding books because their authors are Democrats or their critiques of organized Christianity are unsympathetic. See *Board of Ed., Island Trees Union Free School Dist. No. 26* v. *Pico,* 457 U. S. 853, 870–871 (1982) (plurality opinion). Review for rational basis is probably the most that any court could conduct, owing to the myriad particular selections that might be attacked by someone, and the difficulty of untangling the play of factors behind a particular decision.

At every significant point, however, the Internet blocking here defies comparison to the process of acquisition. Whereas traditional scarcity of money and space require a library to make choices about what to acquire, and the choice to be made is whether or not to spend the money to acquire something, blocking is the subject of a choice made after the money for Internet access has been spent or committed.

---

made available to a library's patrons. If, therefore, a librarian refused to get a book from interlibrary loan for an adult patron on the ground that the patron's "purpose" in seeking the book was not acceptable, the librarian could find no justification in the fact that libraries have traditionally "collect[ed] only those materials deemed to have 'requisite and appropriate quality.'" *Ante,* at 204. In any event, in the ensuing analysis, I assume for the sake of argument that we are in a world without interlibrary loan.

Since it makes no difference to the cost of Internet access whether an adult calls up material harmful for children or the Articles of Confederation, blocking (on facts like these) is not necessitated by scarcity of either money or space.[3]   In the instance of the Internet, what the library acquires is electronic access, and the choice to block is a choice to limit access that has already been acquired.   Thus, deciding against buying a book means there is no book (unless a loan can be obtained), but blocking the Internet is merely blocking access purchased in its entirety and subject to unblocking if the librarian agrees.   The proper analogy therefore is not to passing up a book that might have been bought; it is either to buying a book and then keeping it from adults lacking an acceptable "purpose," or to buying an encyclopedia and then cutting out pages with anything thought to be unsuitable for all adults.

### B

The plurality claims to find support for its conclusions in the "traditional missio[n]" of the public library.   *Ante,* at 205; see also *ante,* at 219 (BREYER, J., concurring in judgment) (considering "traditional library practices").   The plurality thus argues, in effect, that the traditional responsibility of public libraries has called for denying adult access to certain books, or bowdlerizing the content of what the libraries let adults see.   But, in fact, the plurality's conception of a public library's mission has been rejected by the libraries themselves.   And no library that chose to block adult access in the way mandated by the Act could claim that the history of public library practice in this country furnished an implicit

---

[3] Of course, a library that allowed its patrons to use computers for any purposes might feel the need to purchase more computers to satisfy what would presumably be greater demand, see Brief for Appellants 23, but the answer to that problem would be to limit the number of unblocked terminals or the hours in which they could be used.   In any event, the rationale for blocking has no reference whatever to scarcity.

gloss on First Amendment standards, allowing for blocking out anything unsuitable for adults.

Institutional history of public libraries in America discloses an evolution toward a general rule, now firmly rooted, that any adult entitled to use the library has access to any of its holdings.[4]   To be sure, this freedom of choice was apparently not within the inspiration for the mid-19th-century development of public libraries, see J. Shera, Foundations of the Public Library: The Origins of the Public Library Movement in New England, 1629–1855, p. 107 (1949), and in the infancy of their development a "[m]oral censorship" of reading material was assumed, E. Geller, Forbidden Books in American Public Libraries, 1876–1939, p. 12 (1984).   But even in the early 20th century, the legitimacy of the librarian's authority as moral arbiter was coming into question. See, e. g., Belden, President's Address: Looking Forward, 20 Bull. Am. Libr. Assn. 273, 274 (1926) ("The true public library must stand for the intellectual freedom of access to the printed word").   And the practices of European fascism fueled the reaction against library censorship.   See M. Harris, History of Libraries in the Western World 248 (4th ed. 1995).   The upshot was a growing understanding that a librarian's job was to guarantee that "all people had access to all ideas," Geller, *supra*, at 156, and by the end of the 1930s, librarians' "basic position in opposition to censorship [had] emerged," Krug & Harvey, ALA and Intellectual Freedom: A Historical Overview, in Intellectual Freedom Manual, pp. xi, xv (American Library Association 1974) (hereinafter Intellectual Freedom Manual); see also Darling, Access, Intellectual Freedom and Libraries, 27 Library Trends 315–316 (1979).

---

[4] That is, libraries do not refuse materials to adult patrons on account of their content.   Of course, libraries commonly limit access on content-neutral grounds to, say, rare or especially valuable materials.   Such practices raise no First Amendment concerns, because they have nothing to do with suppressing ideas.

By the time McCarthyism began its assaults, appellee American Library Association (ALA) had developed a Library Bill of Rights against censorship, Library Bill of Rights, in Intellectual Freedom Manual, pt. 1, p. 7, and an Intellectual Freedom Committee to maintain the position that beyond enforcing existing laws against obscenity, "there is no place in our society for extra-legal efforts to coerce the taste of others, to confine adults to the reading matter deemed suitable for adolescents, or to inhibit the efforts of writers to achieve artistic expression." Freedom to Read, in *id.*, pt. 2, at 8; see also Krug & Harvey, in *id.*, at xv. So far as I have been able to tell, this statement expressed the prevailing ideal in public library administration after World War II, and it seems fair to say as a general rule that libraries by then had ceased to deny requesting adults access to any materials in their collections. The adult might, indeed, have had to make a specific request, for the literature and published surveys from the period show a variety of restrictions on the circulation of library holdings, including placement of materials apart from open stacks, and availability only upon specific request.[5] But aside from the isolated suggestion, see, *e. g.*, Born, Public Libraries and Intellectual Freedom, in *id.*, pt. 3, at 4, 9, I have not been able to find from this period any record of a library barring access to materials in its collection on a basis other than a reader's age. It seems to have been out of the question for a library to refuse a book in its collection to a requesting adult patron, or to presume to evaluate the basis for a particular request.

This take on the postwar years is confirmed by evidence of the dog that did not bark. During the second half of the

---

[5] See, *e. g.*, M. Fiske, Book Selection and Censorship: A Study of School and Public Libraries in California 69–73 (1959); Moon, "Problem" Fiction, in Book Selection and Censorship in the Sixties 56–58 (E. Moon ed. 1969); F. Jones, Defusing Censorship: The Librarian's Guide to Handling Censorship Conflicts 92–99 (1983); see also The Censorship of Books 173–182 (W. Daniels ed. 1954).

20th century, the ALA issued a series of policy statements, since dubbed Interpretations of the Library Bill of Rights, see *id.*, pt. 1, at 13, commenting on library administration and pointing to particular practices the ALA opposed. Thus, for example, in response to pressure by the Sons of the American Revolution on New Jersey libraries to place labels on materials "advocat[ing] or favor[ing] communism," the ALA in 1957 adopted a "Statement on Labeling," opposing it as "a censor's tool." *Id.*, pt. 1, at 18–19. Again, 10 years later, the ALA even adopted a statement against any restriction on access to library materials by minors. It acknowledged that age restrictions were common across the Nation in "a variety of forms, including, among others, restricted reading rooms for adult use only, library cards limiting circulation of some materials to adults only, closed collections for adult use only, and interlibrary loan for adult use only." *Id.*, pt. 1, at 16. Nevertheless, the ALA opposed all such limitations, saying that "only the parent . . . may restrict his children—and only *his* children—from access to library materials and services." *Id.*, pt. 1, at 17.

And in 1973, the ALA adopted a policy opposing the practice already mentioned, of keeping certain books off the open shelves, available only on specific request. See *id.*, pt. 1, at 42. The statement conceded that " 'closed shelf,' 'locked case,' 'adults only,' or 'restricted shelf' collections" were "common to many libraries in the United States." *Id.*, pt. 1, at 43. The ALA nonetheless came out against it, in these terms: "While the limitation differs from direct censorship activities, such as removal of library materials or refusal to purchase certain publications, it nonetheless constitutes censorship, albeit a subtle form." *Ibid.*[6]

Amidst these and other ALA statements from the latter half of the 20th century, however, one subject is missing.

---

[6] For a complete listing of the ALA's Interpretations, see R. Peck, Libraries, the First Amendment and Cyberspace: What You Need to Know 148–175 (2000).

There is not a word about barring requesting adults from any materials in a library's collection, or about limiting an adult's access based on evaluation of his purposes in seeking materials. If such a practice had survived into the latter half of the 20th century, one would surely find a statement about it from the ALA, which had become the nemesis of anything sounding like censorship of library holdings, as shown by the history just sampled.[7] The silence bespeaks an American public library that gives any adult patron any material at hand, and a history without support for the plurality's reading of the First Amendment as tolerating a public library's censorship of its collection against adult enquiry.

## C

Thus, there is no preacquisition scarcity rationale to save library Internet blocking from treatment as censorship, and no support for it in the historical development of library practice. To these two reasons to treat blocking differently from a decision declining to buy a book, a third must be added. Quite simply, we can smell a rat when a library blocks material already in its control, just as we do when a library removes books from its shelves for reasons having nothing to do with wear and tear, obsolescence, or lack of demand. Content-based blocking and removal tell us something that mere absence from the shelves does not.

I have already spoken about two features of acquisition decisions that make them poor candidates for effective judicial review. The first is their complexity, the number of legitimate considerations that may go into them, not all pointing one way, providing cover for any illegitimate reason that managed to sneak in. A librarian should consider likely demand, scholarly or esthetic quality, alternative purchases,

---

[7] Thus, it is not surprising that, with the emergence of the circumstances giving rise to this case, the ALA has adopted statements opposing restrictions on access to adult patrons, specific to electronic media like the Internet. See id., at 150–153, 176–179, 180–187.

relative cost, and so on. The second reason the judiciary must be shy about reviewing acquisition decisions is the sheer volume of them, and thus the number that might draw fire. Courts cannot review the administration of every library with a constituent disgruntled that the library fails to buy exactly what he wants to read.

After a library has acquired material in the first place, however, the variety of possible reasons that might legitimately support an initial rejection are no longer in play. Removal of books or selective blocking by controversial subject matter is not a function of limited resources and less likely than a selection decision to reflect an assessment of esthetic or scholarly merit. Removal (and blocking) decisions being so often obviously correlated with content, they tend to show up for just what they are, and because such decisions tend to be few, courts can examine them without facing a deluge. The difference between choices to keep out and choices to throw out is thus enormous, a perception that underlay the good sense of the plurality's conclusion in *Board of Ed., Island Trees Union Free School Dist. No. 26 v. Pico*, 457 U. S. 853 (1982), that removing classics from a school library in response to pressure from parents and school board members violates the Speech Clause.

### III

There is no good reason, then, to treat blocking of adult enquiry as anything different from the censorship it presumptively is. For this reason, I would hold in accordance with conventional strict scrutiny that a library's practice of blocking would violate an adult patron's First and Fourteenth Amendment right to be free of Internet censorship, when unjustified (as here) by any legitimate interest in screening children from harmful material.[8] On that ground,

---

[8] I assume, although there is no occasion here to decide, that the originators of the material blocked by the Internet filters could object to the wall between them and any adult audience they might attract, although they

the Act's blocking requirement in its current breadth calls for unconstitutional action by a library recipient, and is itself unconstitutional.

would be unlikely plaintiffs, given that their private audience would be unaffected by the library's action, and many of them might have no more idea that a library is blocking their work than the library does. It is for this reason that I rely on the First and Fourteenth Amendment rights of adult library patrons, who would experience the more acute injury by being denied a look at anything the software identified as apt to harm a child (and whatever else got blocked along with it). In practical terms, if libraries and the National Government are going to be kept from engaging in unjustifiable adult censorship, there is no alternative to recognizing a viewer's or reader's right to be free of paternalistic censorship as at least an adjunct of the core right of the speaker. The plurality in *Board of Ed., Island Trees Union Free School Dist. No. 26* v. *Pico,* 457 U. S. 853 (1982), saw this and recognized the right of students using a school library to object to the removal of disfavored books from the shelves, *id.,* at 865–868 (opinion of Brennan, J.). By the same token, we should recognize an analogous right on the part of a library's adult Internet users, who may be among the 10% of American Internet users whose access comes solely through library terminals, see 201 F. Supp. 2d, at 422. There should therefore be no question that censorship by blocking produces real injury sufficient to support a suit for redress by patrons whose access is denied.