(Slip Opinion)        OCTOBER TERM, 2008        1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## PLEASANT GROVE CITY, UTAH, ET AL. *v.* SUMMUM

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 07–665.   Argued November 12, 2008—Decided February 25, 2009

Pioneer Park (Park), a public park in petitioner Pleasant Grove City
(City), has at least 11 permanent, privately donated displays, includ-
ing a Ten Commandments monument.  In rejecting the request of re-
spondent Summum, a religious organization, to erect a monument
containing the Seven Aphorisms of Summum, the City explained that
it limited Park monuments to those either directly related to the
City's history or donated by groups with longstanding community
ties.  After the City put that policy and other criteria into writing, re-
spondent renewed its request, but did not describe the monument's
historical significance or respondent's connection to the community.
The City rejected the request, and respondent filed suit, claiming
that the City and petitioner officials had violated the First Amend-
ment's Free Speech Clause by accepting the Ten Commandments
monument but rejecting respondent's proposed monument.  The Dis-
trict Court denied respondent's preliminary injunction request, but
the Tenth Circuit reversed.  Noting that it had previously found the
Ten Commandments monument to be private rather than govern-
ment speech and that public parks have traditionally been regarded
as public forums, the court held that, because the exclusion of the
monument was unlikely to survive strict scrutiny, the City was re-
quired to erect it immediately.

*Held:* The placement of a permanent monument in a public park is a
form of government speech and is therefore not subject to scrutiny
under the Free Speech Clause.  Pp. 4–18.

  (a) Because that Clause restricts government regulation of private
speech but not government speech, whether petitioners were engag-
ing in their own expressive conduct or providing a forum for private
speech determines which precedents govern here.  Pp. 4–7.

(1) A government entity "is entitled to say what it wishes," *Rosenberger* v. *Rector and Visitors of Univ. of Va.,* 515 U. S. 819, 833, and to select the views that it wants to express, see, *e.g., Rust* v. *Sullivan*, 500 U. S. 173, 194. It may exercise this same freedom when it receives private assistance for the purpose of delivering a government-controlled message. See *Johanns* v. *Livestock Marketing Assn.*, 544 U. S. 550, 562. This does not mean that there are no restraints on government speech. For example, government speech must comport with the Establishment Clause. In addition, public officials' involvement in advocacy may be limited by law, regulation, or practice; and a government entity is ultimately "accountable to the electorate and the political process for its advocacy," *Board of Regents of Univ. of Wis. System* v. *Southworth*, 529 U. S. 217, 235. Pp. 4–6.

(2) In contrast, government entities are strictly limited in their ability to regulate private speech in "traditional public fora." *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.*, 473 U. S. 788, 800. Reasonable time, place, and manner restrictions are allowed, see *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 45, but content-based restrictions must satisfy strict scrutiny, *i.e.,* they must be narrowly tailored to serve a compelling government interest, see *Cornelius*, *supra*, at 800. Restrictions based on viewpoint are also prohibited. *Carey* v. *Brown*, 447 U. S. 455, 463. Government restrictions on speech in a "designated public forum" are subject to the same strict scrutiny as restrictions in a traditional public forum. *Cornelius*, *supra,* at 800. And where government creates a forum that is limited to use by certain groups or dedicated to the discussion of certain subjects, *Perry Ed. Assn.*, *supra*, at 46, n. 7, it may impose reasonable and viewpoint-neutral restrictions, see *Good News Club* v. *Milford Central School*, 533 U. S. 98, 106–107. Pp. 6–7.

(b) Permanent monuments displayed on public property typically represent government speech. Governments have long used monuments to speak to the public. Thus, a government-commissioned and government-financed monument placed on public land constitutes government speech. So, too, are privately financed and donated monuments that the government accepts for public display on government land. While government entities regularly accept privately funded or donated monuments, their general practice has been one of selective receptivity. Because city parks play an important role in defining the identity that a city projects to its residents and the outside world, cities take care in accepting donated monuments, selecting those that portray what the government decisionmakers view as appropriate for the place in question, based on esthetics, history, and local culture. The accepted monuments are meant to convey and have the effect of conveying a government message and thus consti-

tute government speech. Pp. 7–10.

(c) Here, the Park's monuments clearly represent government speech. Although many were donated in completed form by private entities, the City has "effectively controlled" their messages by exercising "final approval authority" over their selection. *Johanns, supra,* at 560–561. The City has selected monuments that present the image that the City wishes to project to Park visitors; it has taken ownership of most of the monuments in the Park, including the Ten Commandments monument; and it has now expressly set out selection criteria. P. 10.

(d) Respondent's legitimate concern that the government speech doctrine not be used as a subterfuge for favoring certain viewpoints does not mean that a government entity should be required to embrace publicly a privately donated monument's "message" in order to escape Free Speech Clause restrictions. A city engages in expressive conduct by accepting and displaying a privately donated monument, but it does not necessarily endorse the specific meaning that any particular donor sees in the monument. A government's message may be altered by the subsequent addition of other monuments in the same vicinity. It may also change over time. Pp. 10–15.

(e) "[P]ublic forum principles . . . are out of place in the context of this case." *United States* v. *American Library Assn., Inc.*, 539 U. S. 194, 205. The forum doctrine applies where a government property or program is capable of accommodating a large number of public speakers without defeating the essential function of the land or program, but public parks can accommodate only a limited number of permanent monuments. If governments must maintain viewpoint neutrality in selecting donated monuments, they must either prepare for cluttered parks or face pressure to remove longstanding and cherished monuments. Were public parks considered traditional public forums for the purpose of erecting privately donated monuments, most parks would have little choice but to refuse all such donations. And if forum analysis would lead almost inexorably to closing of the forum, forum analysis is out of place. *Capitol Square Review and Advisory Bd.* v. *Pinette*, 515 U. S. 753, distinguished. Pp. 15–18.

483 F. 3d 1044, reversed.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and STEVENS, SCALIA, KENNEDY, THOMAS, GINSBURG, and BREYER, JJ., joined. STEVENS, J., filed a concurring opinion, in which GINSBURG, J., joined. SCALIA, J., filed a concurring opinion, in which THOMAS, J., joined. BREYER, J., filed a concurring opinion. SOUTER, J., filed an opinion concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 07–665

PLEASANT GROVE CITY, UTAH, ET AL., PETITIONERS
*v.* SUMMUM

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[February 25, 2009]

JUSTICE ALITO delivered the opinion of the Court.

This case presents the question whether the Free Speech Clause of the First Amendment entitles a private group to insist that a municipality permit it to place a permanent monument in a city park in which other donated monuments were previously erected. The Court of Appeals held that the municipality was required to accept the monument because a public park is a traditional public forum. We conclude, however, that although a park is a traditional public forum for speeches and other transitory expressive acts, the display of a permanent monument in a public park is not a form of expression to which forum analysis applies. Instead, the placement of a permanent monument in a public park is best viewed as a form of government speech and is therefore not subject to scrutiny under the Free Speech Clause.

I

A

Pioneer Park (or Park) is a 2.5 acre public park located in the Historic District of Pleasant Grove City (or City) in Utah. The Park currently contains 15 permanent dis-

plays, at least 11 of which were donated by private groups or individuals. These include an historic granary, a wishing well, the City's first fire station, a September 11 monument, and a Ten Commandments monument donated by the Fraternal Order of Eagles in 1971.

Respondent Summum is a religious organization founded in 1975 and headquartered in Salt Lake City, Utah. On two separate occasions in 2003, Summum's president wrote a letter to the City's mayor requesting permission to erect a "stone monument," which would contain "the Seven Aphorisms of SUMMUM"[1] and be similar in size and nature to the Ten Commandments monument. App. 57, 59. The City denied the requests and explained that its practice was to limit monuments in the Park to those that "either (1) directly relate to the history of Pleasant Grove, or (2) were donated by groups with longstanding ties to the Pleasant Grove community." *Id.*, at 61. The following year, the City passed a resolution

------

[1] Respondent's brief describes the church and the Seven Aphorisms as follows:

"The Summum church incorporates elements of Gnostic Christianity, teaching that spiritual knowledge is experiential and that through devotion comes revelation, which 'modifies human perceptions, and transfigures the individual.' *See* The Teachings of Summum are the Teachings of Gnostic Christianity, http://www.summum.us/philosophy/gnosticism.shtml (visited Aug. 15, 2008).

"Central to Summum religious belief and practice are the Seven Principles of Creation (the "Seven Aphorisms"). According to Summum doctrine, the Seven Aphorisms were inscribed on the original tablets handed down by God to Moses on Mount Sinai. . . . Because Moses believed that the Israelites were not ready to receive the Aphorisms, he shared them only with a select group of people. In the Summum Exodus account, Moses then destroyed the original tablets, traveled back to Mount Sinai, and returned with a second set of tablets containing the Ten Commandments. *See* The Aphorisms of Summum and the Ten Commandments, http://www.summum.us/philosophy/tencommandments.shtml (visited Aug. 15, 2008)." Brief for Respondent 1–2.

putting this policy into writing. The resolution also mentioned other criteria, such as safety and esthetics.

In May 2005, respondent's president again wrote to the mayor asking to erect a monument, but the letter did not describe the monument, its historical significance, or Summum's connection to the community. The city council rejected this request.

## B

In 2005, respondent filed this action against the City and various local officials (petitioners), asserting, among other claims, that petitioners had violated the Free Speech Clause of the First Amendment by accepting the Ten Commandments monument but rejecting the proposed Seven Aphorisms monument. Respondent sought a preliminary injunction directing the City to permit Summum to erect its monument in Pioneer Park. After the District Court denied Summum's preliminary injunction request, No. 2:05CV00638, 2006 WL 3421838 (D Utah, Nov. 22, 2006), respondent appealed, pressing solely its free speech claim.

A panel of the Tenth Circuit reversed. 483 F. 3d 1044 (2007). The panel noted that it had previously found the Ten Commandments monument to be private rather than government speech. See *Summum* v. *Ogden*, 297 F. 3d 995 (2002). Noting that public parks have traditionally been regarded as public forums, the panel held that the City could not reject the Seven Aphorisms monument unless it had a compelling justification that could not be served by more narrowly tailored means. See 483 F. 3d, at 1054. The panel then concluded that the exclusion of respondent's monument was unlikely to survive this strict scrutiny, and the panel therefore held that the City was required to erect Summum's monument immediately.

The Tenth Circuit denied the City's petition for rehearing en banc by an equally divided vote. 499 F. 3d 1170

(2007). Judge Lucero dissented, arguing that the Park was not a traditional public forum for the purpose of displaying monuments. *Id.*, at 1171. Judge McConnell also dissented, contending that the monuments in the Park constitute government speech. *Id.*, at 1174.

We granted certiorari, 552 U. S. ___ (2008), and now reverse.

## II

No prior decision of this Court has addressed the application of the Free Speech Clause to a government entity's acceptance of privately donated, permanent monuments for installation in a public park, and the parties disagree sharply about the line of precedents that governs this situation. Petitioners contend that the pertinent cases are those concerning government speech. Respondent, on the other hand, agrees with the Court of Appeals panel that the applicable cases are those that analyze private speech in a public forum. The parties' fundamental disagreement thus centers on the nature of petitioners' conduct when they permitted privately donated monuments to be erected in Pioneer Park. Were petitioners engaging in their own expressive conduct? Or were they providing a forum for private speech?

## A

If petitioners were engaging in their own expressive conduct, then the Free Speech Clause has no application. The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech. See *Johanns* v. *Livestock Marketing Assn.*, 544 U. S. 550, 553 (2005) ("[T]he Government's own speech . . . is exempt from First Amendment scrutiny"); *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94, 139, n. 7 (1973) (Stewart, J., concurring) ("Government is not restrained by the First Amendment from controlling

its own expression"). A government entity has the right to "speak for itself." *Board of Regents of Univ. of Wis. System* v. *Southworth*, 529 U. S. 217, 229 (2000). "[I]t is entitled to say what it wishes," *Rosenberger* v. *Rector and Visitors of Univ. of Va.,* 515 U. S. 819, 833 (1995), and to select the views that it wants to express. See *Rust* v. *Sullivan*, 500 U. S. 173, 194 (1991); *National Endowment for Arts* v. *Finley*, 524 U. S. 569, 598 (1998) (SCALIA, J., concurring in judgment) ("It is the very business of government to favor and disfavor points of view").

Indeed, it is not easy to imagine how government could function if it lacked this freedom. "If every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it radically transformed." *Keller* v. *State Bar of Cal.*, 496 U. S. 1, 12–13 (1990). See also *Johanns*, 544 U. S., at 574 (SOUTER, J., dissenting) ("To govern, government has to say something, and a First Amendment heckler's veto of any forced contribution to raising the government's voice in the 'marketplace of ideas' would be out of the question" (footnote omitted)).

A government entity may exercise this same freedom to express its views when it receives assistance from private sources for the purpose of delivering a government-controlled message. See *id.*, at 562 (opinion of the Court) (where the government controls the message, "it is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources"); *Rosenberger*, *supra*, at 833 (a government entity may "regulate the content of what is or is not expressed . . . when it enlists private entities to convey its own message").

This does not mean that there are no restraints on government speech. For example, government speech

must comport with the Establishment Clause. The in-
volvement of public officials in advocacy may be limited by
law, regulation, or practice. And of course, a government
entity is ultimately "accountable to the electorate and the
political process for its advocacy." *Southworth*, 529 U. S.,
at 235. "If the citizenry objects, newly elected officials
later could espouse some different or contrary position."
*Ibid.*

B

While government speech is not restricted by the Free
Speech Clause, the government does not have a free hand
to regulate private speech on government property. This
Court long ago recognized that members of the public
retain strong free speech rights when they venture into
public streets and parks, "which 'have immemorially been
held in trust for the use of the public and, time out of
mind, have been used for purposes of assembly, communi-
cating thoughts between citizens, and discussing public
questions.'" *Perry Ed. Assn.* v. *Perry Local Educators'
Assn.*, 460 U. S. 37, 45 (1983) (quoting *Hague* v. *Committee
for Industrial Organization*, 307 U. S. 496, 515 (1939)
(opinion of Roberts, J.)). In order to preserve this freedom,
government entities are strictly limited in their ability to
regulate private speech in such "traditional public fora."
*Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.*, 473
U. S. 788, 800 (1985). Reasonable time, place, and man-
ner restrictions are allowed, see *Perry Ed. Assn.*, *supra*, at
45, but any restriction based on the content of the speech
must satisfy strict scrutiny, that is, the restriction must be
narrowly tailored to serve a compelling government inter-
est, see *Cornelius*, *supra*, at 800, and restrictions based on
viewpoint are prohibited, see *Carey* v. *Brown*, 447 U. S.
455, 463 (1980).

With the concept of the traditional public forum as a
starting point, this Court has recognized that members of

the public have free speech rights on other types of government property and in certain other government programs that share essential attributes of a traditional public forum. We have held that a government entity may create "a designated public forum" if government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose. See *Cornelius*, 473 U. S., at 802. Government restrictions on speech in a designated public forum are subject to the same strict scrutiny as restrictions in a traditional public forum. *Id.*, at 800.

The Court has also held that a government entity may create a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects. *Perry Ed. Assn.*, *supra*, at 46, n. 7. In such a forum, a government entity may impose restrictions on speech that are reasonable and viewpoint-neutral. See *Good News Club* v. *Milford Central School*, 533 U. S. 98, 106–107 (2001).

### III

There may be situations in which it is difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech, but this case does not present such a situation. Permanent monuments displayed on public property typically represent government speech.

Governments have long used monuments to speak to the public. Since ancient times, kings, emperors, and other rulers have erected statues of themselves to remind their subjects of their authority and power. Triumphal arches, columns, and other monuments have been built to commemorate military victories and sacrifices and other events of civic importance. A monument, by definition, is a structure that is designed as a means of expression. When a government entity arranges for the construction of

a monument, it does so because it wishes to convey some thought or instill some feeling in those who see the structure. Neither the Court of Appeals nor respondent disputes the obvious proposition that a monument that is commissioned and financed by a government body for placement on public land constitutes government speech.

Just as government-commissioned and government-financed monuments speak for the government, so do privately financed and donated monuments that the government accepts and displays to the public on government land. It certainly is not common for property owners to open up their property for the installation of permanent monuments that convey a message with which they do not wish to be associated. And because property owners typically do not permit the construction of such monuments on their land, persons who observe donated monuments routinely—and reasonably—interpret them as conveying some message on the property owner's behalf. In this context, there is little chance that observers will fail to appreciate the identity of the speaker. This is true whether the monument is located on private property or on public property, such as national, state, or city park land.

We think it is fair to say that throughout our Nation's history, the general government practice with respect to donated monuments has been one of selective receptivity. A great many of the monuments that adorn the Nation's public parks were financed with private funds or donated by private parties. Sites managed by the National Park Service contain thousands of privately designed or funded commemorative objects, including the Statue of Liberty, the Marine Corps War Memorial (the Iwo Jima monument), and the Vietnam Veterans Memorial. States and cities likewise have received thousands of donated monuments. See, *e.g.*, App. to Brief for International Municipal Lawyers Association as *Amicus Curiae* 15a–29a (hereinaf-

ter IMLA Brief) (listing examples); Brief for American Legion et al. as *Amici Curiae* 7, and n. 2 (same). By accepting monuments that are privately funded or donated, government entities save tax dollars and are able to acquire monuments that they could not have afforded to fund on their own.

But while government entities regularly accept privately funded or donated monuments, they have exercised selectivity. An example discussed by the city of New York as *amicus curiae* is illustrative. In the wake of the controversy generated in 1876 when the city turned down a donated monument to honor Daniel Webster, the city adopted rules governing the acceptance of artwork for permanent placement in city parks, requiring, among other things, that "any proposed gift of art had to be viewed either in its finished condition or as a model before acceptance." Brief for City of New York as *Amicus Curiae* 4–5 (hereinafter NYC Brief). Across the country, "municipalities generally exercise editorial control over donated monuments through prior submission requirements, design input, requested modifications, written criteria, and legislative approvals of specific content proposals." IMLA Brief 21.

Public parks are often closely identified in the public mind with the government unit that owns the land. City parks—ranging from those in small towns, like Pioneer Park in Pleasant Grove City, to those in major metropolises, like Central Park in New York City—commonly play an important role in defining the identity that a city projects to its own residents and to the outside world. Accordingly, cities and other jurisdictions take some care in accepting donated monuments. Government decisionmakers select the monuments that portray what they view as appropriate for the place in question, taking into account such content-based factors as esthetics, history, and local culture. The monuments that are accepted, therefore, are

meant to convey and have the effect of conveying a gov-ernment message, and they thus constitute government speech.

## IV

### A

In this case, it is clear that the monuments in Pleasant Grove's Pioneer Park represent government speech. Al-though many of the monuments were not designed or built by the City and were donated in completed form by private entities, the City decided to accept those donations and to display them in the Park. Respondent does not claim that the City ever opened up the Park for the placement of whatever permanent monuments might be offered by private donors. Rather, the City has "effectively con-trolled" the messages sent by the monuments in the Park by exercising "final approval authority" over their selec-tion. *Johanns*, 544 U. S., at 560–561. The City has se-lected those monuments that it wants to display for the purpose of presenting the image of the City that it wishes to project to all who frequent the Park; it has taken own-ership of most of the monuments in the Park, including the Ten Commandments monument that is the focus of respondent's concern; and the City has now expressly set forth the criteria it will use in making future selections.

### B

Respondent voices the legitimate concern that the gov-ernment speech doctrine not be used as a subterfuge for favoring certain private speakers over others based on viewpoint. Respondent's suggested solution is to require a government entity accepting a privately donated monu-ment to go through a formal process of adopting a resolu-tion publicly embracing "the message" that the monument conveys. See Brief for Respondent 33–34, 57.

We see no reason for imposing a requirement of this

sort.  The parks of this country contain thousands of do-
nated monuments that government entities have used for
their own expressive purposes, usually without producing
the sort of formal documentation that respondent now
says is required to escape Free Speech Clause restrictions.
Requiring all of these jurisdictions to go back and proclaim
formally that they adopt all of these monuments as their
own expressive vehicles would be a pointless exercise that
the Constitution does not mandate.

In this case, for example, although respondent argues
that Pleasant Grove City has not adequately "controll[ed]
the message," *id.*, at 31, of the Ten Commandments monu-
ment, the City took ownership of that monument and put
it on permanent display in a park that it owns and man-
ages and that is linked to the City's identity.  All rights
previously possessed by the monument's donor have been
relinquished.  The City's actions provided a more dramatic
form of adoption than the sort of formal endorsement that
respondent would demand, unmistakably signifying to all
Park visitors that the City intends the monument to speak
on its behalf.  And the City has made no effort to abridge
the traditional free speech rights—the right to speak,
distribute leaflets, etc.—that may be exercised by respon-
dent and others in Pioneer Park.

What respondent demands, however, is that the City
"adopt" or "embrace" "the message" that it associates with
the monument.  *Id.*, at 33–34, 57.  Respondent seems to
think that a monument can convey only one "message"—
which is, presumably, the message intended by the do-
nor—and that, if a government entity that accepts a
monument for placement on its property does not formally
embrace *that* message, then the government has not en-
gaged in expressive conduct.

This argument fundamentally misunderstands the way
monuments convey meaning.  The meaning conveyed by a
monument is generally not a simple one like "'Beef.  It's

What's for Dinner.'"  *Johanns*, *supra*, at 554.  Even when a monument features the written word, the monument may be intended to be interpreted, and may in fact be interpreted by different observers, in a variety of ways. Monuments called to our attention by the briefing in this case illustrate this phenomenon.

What, for example, is "the message" of the Greco-Roman mosaic of the word "Imagine" that was donated to New York City's Central Park in memory of John Lennon?  See NYC Brief 18; App. to *id.*, at A5.  Some observers may "imagine" the musical contributions that John Lennon would have made if he had not been killed.  Others may think of the lyrics of the Lennon song that obviously inspired the mosaic and may "imagine" a world without religion, countries, possessions, greed, or hunger.[2]

———————

[2] The lyrics are as follows:
"Imagine there's no heaven
It's easy if you try
No hell below us
Above us only sky
Imagine all the people
Living for today...

"Imagine there's no countries
It isn't hard to do
Nothing to kill or die for
And no religion too
Imagine all the people
Living life in peace...

"You may say I'm a dreamer
But I'm not the only one
I hope someday you'll join us
And the world will be as one

"Imagine no possessions
I wonder if you can
No need for greed or hunger
A brotherhood of man
Imagine all the people
Sharing all the world...

Opinion of the Court

Or, to take another example, what is "the message" of the "large bronze statue displaying the word 'peace' in many world languages" that is displayed in Fayetteville, Arkansas?[3]

These text-based monuments are almost certain to evoke different thoughts and sentiments in the minds of different observers, and the effect of monuments that do not contain text is likely to be even more variable. Consider, for example, the statue of Pancho Villa that was given to the city of Tucson, Arizona, in 1981 by the Government of Mexico with, according to a Tucson publication, "a wry sense of irony."[4] Does this statue commemorate a "revolutionary leader who advocated for agrarian reform and the poor" or "a violent bandit"? IMLA Brief 13.

Contrary to respondent's apparent belief, it frequently is not possible to identify a single "message" that is conveyed by an object or structure, and consequently, the thoughts or sentiments expressed by a government entity that accepts and displays such an object may be quite different from those of either its creator or its donor.[5] By accepting

_____

"You may say I'm a dreamer
But I'm not the only one
I hope someday you'll join us
And the world will live as one." J. Lennon, Imagine, on Imagine (Apple Records 1971).

  [3] See IMLA Brief 6–7.

  [4] The Presidio Trail: A Historical Walking Tour of Downtown Tucson, online at http://www.visittucson.org/includes/media/docs/DowntownTour.pdf.

  [5] Museum collections illustrate this phenomenon. Museums display works of art that express many different sentiments, and the significance of a donated work of art to its creator or donor may differ markedly from a museum's reasons for accepting and displaying the work. For example, a painting of a religious scene may have been commissioned and painted to express religious thoughts and feelings. Even if the painting is donated to the museum by a patron who shares those thoughts and feelings, it does not follow that the museum, by displaying the painting, intends to convey or is perceived as conveying the

a privately donated monument and placing it on city property, a city engages in expressive conduct, but the intended and perceived significance of that conduct may not coincide with the thinking of the monument's donor or creator. Indeed, when a privately donated memorial is funded by many small donations, the donors themselves may differ in their interpretation of the monument's significance.[6] By accepting such a monument, a government entity does not necessarily endorse the specific meaning that any particular donor sees in the monument.

The message that a government entity conveys by allowing a monument to remain on its property may also be altered by the subsequent addition of other monuments in the same vicinity. For example, following controversy over the original design of the Vietnam Veterans Memorial, a compromise was reached that called for the nearby addition of a flagstaff and bronze Three Soldiers statue, which many believed changed the overall effect of the memorial. See, *e.g.*, J. Mayo, War Memorials as Political Landscape: The American Experience and Beyond 202–203, 205 (1988); K. Hass, Carried to the Wall: American Memory and the Vietnam Veterans Memorial 15–18 (1998).

The "message" conveyed by a monument may change over time. A study of war memorials found that "people reinterpret" the meaning of these memorials as "historical interpretations" and "the society around them changes." Mayo, *supra*, at 8–9.

A striking example of how the interpretation of a monument can evolve is provided by one of the most famous and

———————

same "message."

  [6] For example, the Vietnam Veterans Memorial Fund is a private organization that obtained funding from over 650,000 donors for the construction of the memorial itself. These donors expressed a wide range of personal sentiments in contributing money for the memorial. See, *e.g.*, J. Scruggs & J. Swerdlow, To Heal a Nation: The Vietnam Veterans Memorial 23–28, 159 (1985).

beloved public monuments in the United States, the Statue of Liberty. The statue was given to this country by the Third French Republic to express republican solidarity and friendship between the two countries. See J. Res. 6, 44th Cong., 2d Sess. (1877), 19 Stat. 410 (accepting the statue as an "expressive and felicitous memorial of the sympathy of the citizens of our sister Republic"). At the inaugural ceremony, President Cleveland saw the statue as an emblem of international friendship and the widespread influence of American ideals. See Inauguration of the Statue of Liberty Enlightening the World 30 (1887). Only later did the statue come to be viewed as a beacon welcoming immigrants to a land of freedom. See Public Papers of the Presidents, Ronald Reagan, Vol. 2, July 3, 1986, pp. 918–919 (1989), Remarks at the Opening Ceremonies of the Statue of Liberty Centennial Celebration in New York, New York; J. Higham, The Transformation of the Statue of Liberty, in Send These To Me 74–80 (rev. ed. 1984).

C

Respondent and the Court of Appeals analogize the installation of permanent monuments in a public park to the delivery of speeches and the holding of marches and demonstrations, and they thus invoke the rule that a public park is a traditional public forum for these activities. But "public forum principles . . . are out of place in the context of this case." *United States* v. *American Library Assn., Inc.*, 539 U. S. 194, 205 (2003). The forum doctrine has been applied in situations in which government-owned property or a government program was capable of accommodating a large number of public speakers without defeating the essential function of the land or the program. For example, a park can accommodate many speakers and, over time, many parades and demonstrations. The Combined Federal Campaign permits hundreds

of groups to solicit donations from federal employees. See *Cornelius*, 473 U. S., at 804–805. A public university's student activity fund can provide money for many campus activities. See *Rosenberger*, 515 U. S., at 825. A public university's buildings may offer meeting space for hundreds of student groups. See *Widmar* v. *Vincent*, 454 U. S. 263, 274–275 (1981). A school system's internal mail facilities can support the transmission of many messages to and from teachers and school administrators. See *Perry Ed. Assn.*, 460 U. S., at 39, 46–47. See also *Arkansas Ed. Television Comm'n* v. *Forbes*, 523 U. S. 666, 680–681 (1998) (noting that allowing any candidate to participate in a televised political debate would be burdensome on "logistical grounds" and "would result in less speech, not more").

By contrast, public parks can accommodate only a limited number of permanent monuments. Public parks have been used, "'time out of mind, . . . for purposes of assembly, communicating thoughts between citizens, and discussing public questions,'" *Perry Ed. Assn.*, *supra*, at 45 (quoting *Hague*, 307 U. S., at 515), but "one would be hard pressed to find a 'long tradition' of allowing people to permanently occupy public space with any manner of monuments." 499 F. 3d, at 1173 (Lucero, J., dissenting from denial of rehearing en banc).

Speakers, no matter how long-winded, eventually come to the end of their remarks; persons distributing leaflets and carrying signs at some point tire and go home; monuments, however, endure. They monopolize the use of the land on which they stand and interfere permanently with other uses of public space. A public park, over the years, can provide a soapbox for a very large number of orators—often, for all who want to speak—but it is hard to imagine how a public park could be opened up for the installation of permanent monuments by every person or group wishing to engage in that form of expression.

Respondent contends that this issue "can be dealt with through content-neutral time, place and manner restrictions, including the option of a ban on all unattended displays." Brief for Respondent 14. On this view, when France presented the Statue of Liberty to the United States in 1884, this country had the option of either (a) declining France's offer or (b) accepting the gift, but providing a comparable location in the harbor of New York for other statues of a similar size and nature (*e.g.*, a Statue of Autocracy, if one had been offered by, say, the German Empire or Imperial Russia).

While respondent and some of its *amici* deride the fears expressed about the consequences of the Court of Appeals holding in this case, those concerns are well founded. If government entities must maintain viewpoint neutrality in their selection of donated monuments, they must either "brace themselves for an influx of clutter" or face the pressure to remove longstanding and cherished monuments. See 499 F. 3d, at 1175 (McConnell, J., dissenting from denial of rehearing en banc). Every jurisdiction that has accepted a donated war memorial may be asked to provide equal treatment for a donated monument questioning the cause for which the veterans fought. New York City, having accepted a donated statue of one heroic dog (Balto, the sled dog who brought medicine to Nome, Alaska, during a diphtheria epidemic)[7] may be pressed to accept monuments for other dogs who are claimed to be equally worthy of commemoration. The obvious truth of the matter is that if public parks were considered to be traditional public forums for the purpose of erecting privately donated monuments, most parks would have little choice but to refuse all such donations. And where the application of forum analysis would lead almost inexorably

---

[7] See NYC Brief 2; App. to Brief for American Catholic Lawyers Association as *Amicus Curiae* 1a–10.

to closing of the forum, it is obvious that forum analysis is out of place.

Respondent compares the present case to *Capitol Square Review and Advisory Bd.* v. *Pinette*, 515 U. S. 753 (1995), but that case involved a very different situation—a request by a private group, the Ku Klux Klan, to erect a cross for a period of 16 days on public property that had been opened up for similar temporary displays, including a Christmas tree and a menorah. See *id.*, at 758. Although some public parks can accommodate and may be made generally available for temporary private displays, the same is rarely true for permanent monuments.

To be sure, there are limited circumstances in which the forum doctrine might properly be applied to a permanent monument—for example, if a town created a monument on which all of its residents (or all those meeting some other criterion) could place the name of a person to be honored or some other private message. But as a general matter, forum analysis simply does not apply to the installation of permanent monuments on public property.

## V

In sum, we hold that the City's decision to accept certain privately donated monuments while rejecting respondent's is best viewed as a form of government speech. As a result, the City's decision is not subject to the Free Speech Clause, and the Court of Appeals erred in holding otherwise. We therefore reverse.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 07–665

PLEASANT GROVE CITY, UTAH, ET AL., PETITIONERS
*v.* SUMMUM

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[February 25, 2009]

JUSTICE STEVENS, with whom JUSTICE GINSBURG joins,
concurring.

This case involves a property owner's rejection of an
offer to place a permanent display on its land.  While I join
the Court's persuasive opinion, I think the reasons justify-
ing the city's refusal would have been equally valid if its
acceptance of the monument, instead of being character-
ized as "government speech," had merely been deemed an
implicit endorsement of the donor's message.  See *Capitol
Square Review and Advisory Bd.* v. *Pinette*, 515 U. S. 753,
801–802 (1995) (STEVENS, J., dissenting).

To date, our decisions relying on the recently minted
government speech doctrine to uphold government action
have been few and, in my view, of doubtful merit.  See,
*e.g., Garcetti* v. *Ceballos*, 547 U. S. 410 (2006); *Johanns* v.
*Livestock Marketing Assn.*, 544 U. S. 550 (2005); *Rust* v.
*Sullivan*, 500 U. S. 173 (1991).  The Court's opinion in this
case signals no expansion of that doctrine.  And by joining
the Court's opinion, I do not mean to indicate agreement
with our earlier decisions.  Unlike other decisions relying
on the government speech doctrine, our decision in this
case excuses no retaliation for, or coercion of, private
speech.  Cf. *Garcetti*, 547 U. S., at 438 (SOUTER, J., dis-
senting); *Rust*, 500 U. S., at 212 (Blackmun, J., dissent-
ing).  Nor is it likely, given the near certainty that observ-

ers will associate permanent displays with the governmental property owner, that the government will be able to avoid political accountability for the views that it endorses or expresses through this means.  Cf. *Johanns*, 544 U. S., at 571–572 (SOUTER, J., dissenting).  Finally, recognizing permanent displays on public property as government speech will not give the government free license to communicate offensive or partisan messages.  For even if the Free Speech Clause neither restricts nor protects government speech, government speakers are bound by the Constitution's other proscriptions, including those supplied by the Establishment and Equal Protection Clauses.  Together with the checks imposed by our democratic processes, these constitutional safeguards ensure that the effect of today's decision will be limited.

# SUPREME COURT OF THE UNITED STATES

No. 07–665

PLEASANT GROVE CITY, UTAH, ET AL., PETITIONERS
*v.* SUMMUM

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[February 25, 2009]

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring.

As framed and argued by the parties, this case presents a question under the Free Speech Clause of the First Amendment. I agree with the Court's analysis of that question and join its opinion in full. But it is also obvious that from the start, the case has been litigated in the shadow of the First Amendment's *Establishment* Clause: the city wary of associating itself too closely with the Ten Commandments monument displayed in the park, lest that be deemed a breach in the so-called "wall of separation between church and State," *Reynolds* v. *United States*, 98 U. S. 145, 164 (1879); respondent exploiting that hesitation to argue that the monument is not government speech because the city has not sufficiently "adopted" its message. Respondent menacingly observed that while the city could have formally adopted the monument as its own, that "might of course raise Establishment Clause issues." Brief for Respondent 34, n. 11.

The city ought not fear that today's victory has propelled it from the Free Speech Clause frying pan into the Establishment Clause fire. Contrary to respondent's intimations, there are very good reasons to be confident that the park displays do not violate *any* part of the First Amendment.

In *Van Orden* v. *Perry*, 545 U. S. 677 (2005), this Court upheld against Establishment Clause challenge a virtually identical Ten Commandments monument, donated by the very same organization (the Fraternal Order of Eagles), which was displayed on the grounds surrounding the Texas State Capitol. Nothing in that decision suggested that the outcome turned on a finding that the monument was only "private" speech. To the contrary, all the Justices agreed that government speech was at issue, but the Establishment Clause argument was nonetheless rejected. For the plurality, that was because the Ten Commandments "have an undeniable historical meaning" in addition to their "religious significance," *id.*, at 690 (opinion of Rehnquist, C. J.). JUSTICE BREYER, concurring in the judgment, agreed that the monument conveyed a permissible secular message, as evidenced by its location in a park that contained multiple monuments and historical markers; by the fact that it had been donated by the Eagles "as part of that organization's efforts to combat juvenile delinquency"; and by the length of time (40 years) for which the monument had gone unchallenged. *Id.*, at 701–703. See also *id.*, at 739–740 (SOUTER, J., dissenting).

Even accepting the narrowest reading of the narrowest opinion necessary to the judgment in *Van Orden*, there is little basis to distinguish the monument in this case: Pioneer Park includes "15 permanent displays," *ante*, at 1–2; it was donated by the Eagles as part of its national effort to combat juvenile delinquency, Brief for Respondent 3; and it was erected in 1971, *ibid.*, which means it is approaching its (momentous!) 40th anniversary.

The city can safely exhale. Its residents and visitors can now return to enjoying Pioneer Park's wishing well, its historic granary—and, yes, even its Ten Commandments monument—without fear that they are complicit in an establishment of religion.

# SUPREME COURT OF THE UNITED STATES

———————

No. 07–665

———————

## PLEASANT GROVE CITY, UTAH, ET AL., PETITIONERS *v.* SUMMUM

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[February 25, 2009]

JUSTICE BREYER, concurring.

I agree with the Court and join its opinion. I do so, however, on the understanding that the "government speech" doctrine is a rule of thumb, not a rigid category. Were the City to discriminate in the selection of permanent monuments on grounds unrelated to the display's theme, say solely on political grounds, its action might well violate the First Amendment.

In my view, courts must apply categories such as "government speech," "public forums," "limited public forums," and "nonpublic forums" with an eye towards their purposes—lest we turn "free speech" doctrine into a jurisprudence of labels. Cf. *United States* v. *Kokinda*, 497 U. S. 720, 740–743 (1990) (Brennan, J., dissenting). Consequently, we must sometimes look beyond an initial categorization. And, in doing so, it helps to ask whether a government action burdens speech disproportionately in light of the action's tendency to further a legitimate government objective. See, e.g., *Ysursa* v. *Pocatello Ed. Assn., ante,* at 1–4 (BREYER, J., concurring in part and dissenting in part); *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 404 (2000) (BREYER, J., concurring).

Were we to do so here, we would find—for reasons that the Court sets forth—that the City's action, while preventing Summum from erecting its monument, does not dis-

proportionately restrict Summum's freedom of expression. The City has not closed off its parks to speech; no one claims that the City prevents Summum's members from engaging in speech in a form more transient than a permanent monument. Rather, the City has simply reserved some space in the park for projects designed to further other than free-speech goals. And that is perfectly proper. After all, parks do not serve speech-related interests alone. To the contrary, cities use park space to further a variety of recreational, historical, educational, aesthetic, and other civic interests. To reserve to the City the power to pick and choose among proposed monuments according to criteria reasonably related to one or more of these legitimate ends restricts Summum's expression, but, given the impracticality of alternatives and viewed in light of the City's legitimate needs, the restriction is not disproportionate. Analyzed either way, as "government speech" or as a proportionate restriction on Summum's expression, the City's action here is lawful.

# SUPREME COURT OF THE UNITED STATES

———————

No. 07–665

———————

## PLEASANT GROVE CITY, UTAH, ET AL., PETITIONERS *v.* SUMMUM

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[February 25, 2009]

JUSTICE SOUTER, concurring in the judgment.

I agree with the Court that the Ten Commandments monument is government speech, that is, an expression of a government's position on the moral and religious issues raised by the subject of the monument. See *Board of Regents of Univ. of Wis. System* v. *Southworth*, 529 U. S. 217, 235 (2000) (noting government speech may "promote [government's] own policies or . . . advance a particular idea"). And although the government should lose when the character of the speech is at issue and its governmental nature has not been made clear, see *Johanns* v. *Livestock Marketing Assn.*, 544 U. S. 550, 577 (2005) (SOUTER, J., dissenting), I also agree with the Court that the city need not satisfy the particular formality urged by Summum as a condition of recognizing that the expression here falls within the public category. I have qualms, however, about accepting the position that public monuments are government speech categorically. See *ante*, at 8 ("Just as government-commissioned and government-financed monuments speak for the government, so do privately financed and donated monuments that the government accepts and displays to the public on government land").

Because the government speech doctrine, as JUSTICE STEVENS notes, *ante*, at 1 (concurring opinion), is "recently

minted," it would do well for us to go slow in setting its bounds, which will affect existing doctrine in ways not yet explored. Even though, for example, Establishment Clause issues have been neither raised nor briefed before us, there is no doubt that this case and its government speech claim has been litigated by the parties with one eye on the Establishment Clause, see *ante*, at 1 (SCALIA, J., concurring). The interaction between the "government speech doctrine" and Establishment Clause principles has not, however, begun to be worked out.

The case shows that it may not be easy to work out. After today's decision, whenever a government maintains a monument it will presumably be understood to be engaging in government speech. If the monument has some religious character, the specter of violating the Establishment Clause will behoove it to take care to avoid the appearance of a flat-out establishment of religion, in the sense of the government's adoption of the tenets expressed or symbolized. In such an instance, there will be safety in numbers, and it will be in the interest of a careful government to accept other monuments to stand nearby, to dilute the appearance of adopting whatever particular religious position the single example alone might stand for. As mementoes and testimonials pile up, however, the chatter may well make it less intuitively obvious that the government is speaking in its own right simply by maintaining the monuments.

If a case like that occurred, as suspicion grew that some of the permanent displays were not government speech at all (or at least had an equally private character associated with private donors), a further Establishment Clause prohibition would surface, the bar against preferring some religious speakers over others. See *Wallace* v. *Jaffree*, 472 U. S. 38, 113 (1985) (Rehnquist, J., dissenting) ("The Clause was also designed to stop the Federal Government from asserting a preference for one religious denomination

or sect over others"). But the government could well argue, as a development of government speech doctrine, that when it expresses its own views, it is free of the Establishment Clause's stricture against discriminating among religious sects or groups. Under this view of the relationship between the two doctrines, it would be easy for a government to favor some private religious speakers over others by its choice of monuments to accept.

Whether that view turns out to be sound is more than I can say at this point. It is simply unclear how the relatively new category of government speech will relate to the more traditional categories of Establishment Clause analysis, and this case is not an occasion to speculate. It is an occasion, however, to try to keep the inevitable issues open, and as simple as they can be. One way to do that is to recognize that there are circumstances in which government maintenance of monuments does not look like government speech at all. Sectarian identifications on markers in Arlington Cemetery come to mind. And to recognize that is to forgo any categorical rule at this point.

To avoid relying on a *per se* rule to say when speech is governmental, the best approach that occurs to me is to ask whether a reasonable and fully informed observer would understand the expression to be government speech, as distinct from private speech the government chooses to oblige by allowing the monument to be placed on public land. This reasonable observer test for governmental character is of a piece with the one for spotting forbidden governmental endorsement of religion in the Establishment Clause cases. See, *e.g.*, *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 630, 635–636 (1989) (O'Connor, J., concurring in part and concurring in judgment). The adoption of it would thus serve coherence within Establishment Clause law, and it would make sense of our common understanding that some monu-

ments on public land display religious symbolism that clearly does not express a government's chosen views.

Application of this observer test provides the reason I find the monument here to be government expression.